Roy Medlin and Jean Medlin

*v.*

Allied Investment Company.

398 S.W.2d 270.

(*Jackson,* April Term, 1965.)

Opinion filed January 5, 1966.

JAMES T. ALLISON and J. W. KIRKPATRICK, Memphis, for plaintiffs in error, CLIFTON, MACK & KIRKPATRICK, Memphis, of counsel.

FRED E. JONES, Memphis, for defendant in error.

MR. CHIEF JUSTICE BURNETT delivered the opinion of the Court.

Plaintiffs-plaintiffs in error, Mr. and Mrs. Roy Medlin, brought an action against defendant-defendant in error, Allied Investment Company, for damages arising out of

the following interaction of the parties. In the recitation of the facts and thereafter in this opinion, the parties will be referred to as plaintiffs and defendant as they appeared in the trial court.

The defendant is a corporation in the business of lending money, such loans secured by a mortgage or deed of trust, to finance the purchase of real estate. Plaintiffs make monthly payments to the defendant on a note, signed by both of them, representing the money the plaintiffs borrowed to purchase their home. Plaintiffs began making these payments by check or money order in September of 1962. In November of 1963 the defendant returned the plaintiffs' check for Seventy-one Dollars representing that month's payment, stating that the November payment in solido was not acceptable because the October payment had not been paid and therefore the only acceptable payment was one which would represent not only the November installment, but the October payment (in addition to late charges thereon) as well. Upon the return of the November payment with the reason therefor to the plaintiffs, Mrs. Medlin called the office of the defendant and attempted to explain to the defendant's agent, who handled their account, that the October payment had been made by money order which was mailed to the defendant's office on the eleventh of October. The defendant's agent told Mrs. Medlin that it would be necessary for her to trace the money order to ascertain whether or not it had been received and cashed by the defendant since defendant's records showed that the October payment in dispute had never been paid.

Believing that the records of his company were correct in showing non-payment for the month of October, the defendant's agent caused a notice of default to be sent to

the Federal Housing Administration. As a result of this notice of default, plaintiffs received a notice of foreclosure from the Federal Housing Administration. In the meantime the plaintiffs had retendered their payment for November which was again refused by the defendant.

On December 16, 1963, plaintiffs sent defendant a check in the amount of One Hundred Forty-three Dollars and Seventy-two Cents for the December and January payments. This check was accepted and deposited by the defendant without question. On December 18, 1963, the defendant accepted the November payment which had previously been refused.

The plaintiffs traced the disputed money order covering the October payment and found that it had been received and cashed by the defendant.

The plaintiffs then employed an attorney who wrote the defendant, setting forth the method, amount and dates of all payments made by plaintiffs since October 1963. The letter further established that plaintiffs had proof from the American Express Company that the money order for the October payment had been cashed by the defendant. The defendant's response to this letter was to the effect that the attorney was in error concerning the October payment and that there was now reason to question the payment for July 1963, and requested proof from the plaintiffs that they had paid the July installment.

Plaintiffs attempted to pay the February 1964 installment by check which was returned with the explanation that defendant's "records indicate your loan to now be in default and delinquent for the payment maturing on January 1, 1964, and thereafter." In March 1964, defendant's agent caused another notice of default to be sent to the Federal Housing Administration and another

notice, dated March 31, 1964, was sent to the plaintiffs threatening foreclosure if the default was not promptly cleared.

The plaintiffs employed another attorney to represent them. In April of 1964, this attorney wrote the defendant, attaching cancelled checks and money orders as exhibits to his letter, showing each payment since April 1963, including a photostatic copy of the money order covering the disputed payment of July 1963. Also attached to the letter was a renewed tender of the payments necessary to bring the defendant's account current which had previously been refused by the defendant.

The following day, April 14, 1964, the defendant sent a letter by certified mail to the plaintiffs, stating that they had located the disputed July 1963 payment, and plaintiffs' loan was current and correct through April 30, 1964.

During the months of November and December of 1963, Mrs. Medlin made telephone calls to the defendant's office in an attempt to convince defendant that the disputed October payment had been made. It is alleged that in the course of these conversations that the defendant's agent was abusive and insulting. The plaintiffs' daughter had recently died and the defendant knew this fact at the time of these telephone conversations and the dispute over the housepayments.

It is alleged that these telephone conversations and the defendant's erroneous sending of default notices to the Federal Housing Administration which caused two warnings of foreclosure to be sent to the plaintiffs resulted in an aggravation of plaintiff Mrs. Medlin's already nervous condition; Mrs. Medlin having recently lost her daughter.

It is further alleged that this aggravation was to such an extent that Mrs. Medlin's nervous condition became manifest in the form of headaches.

In order to clarify the question on this appeal, the preceding facts alleged in the declaration will be paraphrased in terms of legal conclusions.

This action is a tort action, brought by the Medlins against Allied Investment Company, for damages arising out of the alleged intentional interference with Mrs. Medlin's peace of mind. The trial judge sustained a demurrer to the declaration on the ground that the plaintiff had failed to state a claim on which relief could be granted.

The question raised by the demurrer in this particular case is whether the law recognizes and protects a right to emotional tranquility where recovery is sought for mental or emotional disturbance alone, unconnected with any independently actionable tort or with any contemporaneous or consequential objectively ascertainable injury.

As children we were taught that it was "wrong" to strike another person. We understood this because we were "hurt" when someone struck us. Similarly we were taught that good manners and decency dictated that we refrain from intentionally "hurting someone's feelings." What we are dealing with in the present case is an extention of this second fundamental principle of interpersonal relationships. We now know as adults that the law protects persons from being "struck" in the sense that we perceive the striking through our perceptory sense of touch and the striking is of such a degree that we are "hurt". Does the law, however, protect persons

when they are "struck" in the sense that the "striking" is perceived through a sensory mechanism other than that of touch?

Memory and empathy tell us that the "hurt" perceived through sensory media other than that of touch may be just as painful if not more so than the "hurt" perceived by the tactile sense. Moreover, physicians tell us that the consequences of invasions of the person accomplished through the perceptory media of sight and sound may be *as* damaging, if not *more* damaging than invasions of the person accomplished through the sense of touch.

Though the law has long recognized and protected the interest in being free from unpermitted touchings by others, it has been slow to recognize and protect the interest in being free from "mental" interference, such being characterized as "mental" because of the sensory capacity utilized to accomplish the hurt and because there is no objectively ascertainable injury.

Because we personally know of "hurt feelings" and are informed by competent physicians of the damage to the body which may result therefrom, the common law phrase, 'an invasion of a legal right the law will redress,' rings in our ears. The ring of another common law principle sounds in our ears simultaneosuly, "damnum absque injuria"; the two sounds are disharmonious.

The source of this second sound comes from *Lynch v. Knight,* 9 H.L.Cas. 577, 598 (1861), where Lord Wensleydale uttered a generalization frequently found in law books: "Mental pain or anxiety the law cannot value, and does not pretend to redress, when the unlawful act complained of causes that alone." The common law has been reluctant to recognize the interest in one's peace of mind

as deserving of general and independent legal protection, even as against intentional invasions. It is not until comparatively recent years that the dictum of *Lynch v. Knight,* supra, has been overcome and there has been any general admission that the infliction of mental distress, standing alone, may serve as the basis of an action, apart from any other tort.

Various reasons have been advanced for this reluctance to redress mental injuries. At the time when Lord Wensleydale wrote the opinion in *Lynch v. Knight,* supra, mental pain or anxiety was regarded as something "metaphysical," "too subtle and speculative to be capable of admeasurement by any standard known to the law." *Mitchell v. Rochester R. Co.* (1896), 151 N.Y. 107, 45 N.E. 354, 34 L.R.A. 781, Law of Torts, Wm. L. Prosser, 2nd ed., p. 38. Mental suffering, however, is no more difficult to prove and no harder to calculate in terms of money than the physical pain of a broken leg which has never been denied compensation and courts have been quite willing to allow large sums of money as damages for mental anguish itself where it accompanies a slight physical injury [See Prosser, Law of Torts, (supra n. 140)].

Another reason advanced for disallowing recovery for mental anguish standing alone is that mental injuries are so intangible and peculiar and vary to such an extent with the individual concerned, that they cannot be anticipated and, therefore, lie outside any reasonable proximate connection with the act of the defendant. Since medical science has long since recognized that not only fright and shock, but also grief, anxiety, rage and shame are in themselves "physical" injuries in the sense that they produce well marked changes in the body, and

symptoms that are readily visible to the professional eye; the layman now understands to some extent that such consequences are normal, rather than the unusual result of many types of conduct. See Goodrich, Emotional Disturbance as Legal Damage, 20 Mich.L.Rev. 497 (1922). In accordance with this enlightened position on the cause and effect of mental injuries, most courts have logically discarded foreseeability as the sole criterion of legal cause.

The common law rule that mental anguish without other actual injury will not support an action for damages has continued as a legal principle even though the forementioned reasons for maintaining such a rule have been rebutted. This principle does not have the rigidity that it did at common law, but the courts have only allowed actions of this sort in very limited situations.

Before stating what the limitations on this type of action are, let us examine why the court house doors have not been flung open to redress injuries to the mental well being of a person. The most valid objection to the protection of such interests lies in the "wide door" which might be opened, not only to fictitious claims, but to trivialities and mere bad manners. [See Prosser— Law of Torts (supra) p. 39, n. 18]. The law cannot be responsible for absolute peace of mind, and many interferences must be left to other agencies of social control.

> "Against a large part of the frictions and irritations and clashing of temperaments incident to participation in community life, a certain toughening of the mental hide is a better protection than the law could ever be." Magruder, Mental and Emotional Disturbance in the Law of Torts, 1936, 49 Harvard L.Rev. 1033, 1035.

This Court feels that the administrative policy consideration is of great weight in deciding whether or not an action may be maintained for mental interference standing alone. In the face of this strong policy consideration, however, recovery has been allowed for interference with peace of mind in certain situations. It is the opinion of this Court that certain factors present in these cases which have allowed an action for mental injury alone outweighed the valid policy consideration against allowing such actions.

These factors are set out in the Restatement of Torts (2d), sec. 46, ''Outrageous Conduct Causing Severe Emotional Distress''.

''(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm results from it, for such bodily harm.''

Clarification of this statement is found in the following comment:

''d. *Extreme and Outrageous Conduct.* The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct is characterized by 'malice', or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and

utterly untolerable in a civilized community. General-
ly, the case is one in which the recitation of the facts
to an average member of the community would arouse
his resentment against the actor, and lead him to ex-
claim, 'Outrageous.'

"The liability clearly does not extend to mere insults,
indignities, threats, annoyances, petty oppression, or
other trivialities."

From the foregoing portion of the Restatement, we
find the two factors which must concur in order to out-
weigh the policy against allowing an action for the
infliction of mental disturbance: (a) the conduct com-
plained of must have been outrageous, not tolerated in
civilized society, and (b) as a result of the outrageous
conduct, there must be serious mental injury. Stated an-
other way, there are two valid policies fighting for
recognition; the interest in a judicial climate which does
not become burdened with trivial lawsuits versus the
interest a person has in being free from unreasonable
emotional disturbance. The result of this policy conflict
has been somewhat of a compromise. The law has devel-
oped to the extent that the personal interest in peace of
mind is protected from "outrageous" interference which
results in substantial emotional damage, and at the same
time the policy of protecting the judicial process from
trivial claims has been protected by disallowing claims
which are not founded on conduct which can be charac-
terized as "outrageous." [See complete annotation in 64
A.L.R.2d 100]. This approach gives limited protection
to the interest in emotional tranquility.

■■ The declaration of the plaintiffs is insufficient
because the plaintiffs have not alleged a course of conduct
on the part of the defendant which could be classed as

outrageous. It is not enough in an action of this kind to allege a legal conclusion; the actionable conduct should be set out in the declaration. The defendant's conduct, as set out in the declaration shows that the defendant was negligent in keeping his records and that because of this negligence, he caused two notices of default to the Medlins. He was abusive to Mrs. Medlin on the telephone, but the substance and severity of the abuse is not set out in the declaration, therefore we cannot ascribe the term "outrageous" to this alleged abuse.

We find no reported case which has allowed recovery in a situation such as this where there is no outrageous conduct as opposed to simple negligence. The plaintiff cites *Urban v. Hartford Gas Co.*, 139 Conn. 301, 93 A.2d 292, as a case which is authority for recovery in the case at bar. The conduct of the defendant in the Urban case was clearly such an outrage that recovery was properly allowed. The Urbans had bought a hot-water heater from the defendant under a contract calling for the payment of the purchase price in equal monthly installments. The defendant thereupon set up the appliance in the Urban home. At a subsequent time the heater was actually repossessed because of a mistaken belief on the part of the defendant that the Urbans had not paid their monthly installments. At the time of the repossession the employees stated to several people that the Urbans did not pay their debts and implied that Mrs. Urban and her husband were "deadbeats" and delinquent debtors. As a result Mrs. Urban became hysterical and emotionally upset. This caused an arrested diabetic condition to flare up and directly led to a prolonged illness. The conduct complained of in the Urban case is clearly more outrageous than that complained of in the instant case. It would seem that had there been some public imputation

of dishonesty attributed to the Medlins, their case would have been considerably stronger.

In every case cited by the plaintiff (all these cases can be found in 64 A.L.R.2d 100) there has been conduct on the part of the defendant, manifestly more outrageous than that of the instant case:

"It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so."

Restatement of Torts (2d) sec. 46—Comment—p. 77

Thus we conclude by saying that the conduct alleged in the declaration cannot be deemed to be sufficiently outrageous to allow recovery under these circumstances, and we accordingly affirm the trial judge. The case is dismissed with costs to be paid by the plaintiffs in error.