**Donald DUNBAR and wife, Delana Dunbar, Plaintiffs-Appellants,**

v.

**John Howard STRIMAS, M.D., Defendant-Appellee.**

Court of Appeals of Tennessee, Eastern Section.

Dec. 4, 1981.

Permissions to Appeal Denied by Supreme Court May 3, 1982.

Myers, Saylor & Johnson and Evan M. Meade, Johnson City, for plaintiffs-appellants.

J. Paul Coleman, Johnson City, S. Morris Hadden, Kingsport, Thomas J. Seeley, Jr., Erwin, for defendant-appellee.

## OPINION

FRANKS, Judge.

Plaintiffs sued to recover compensatory and punitive damages for alleged "severe emotional distress" inflicted upon plaintiff, Delana Dunbar, by defendant's course of conduct which plaintiffs alleged "constituted outrageous conduct."

Acting on a motion to dismiss filed by defendant after each side filed affidavits, the trial judge dismissed the suit on the grounds: "that the bill of complaint does not state a cause of action based upon outrageous conduct" and, apparently, on the ground of privileged conduct, *i.e.,* "no cause of action exists against this physician-Coroner/Medical Examiner by reason of his conduct in doing the job he was appointed to do, to investigate a suspicious death."

Plaintiffs appealed.

Since matters outside the pleadings were presented and considered by the court, the motion was treated as one for summary judgment under T.R.C.P., Rule 56. T.R. C.P., 12.02. In our review of the case we are required to consider the record in the light most favorable to plaintiffs and, if disputed issues of material fact are established, the motion cannot be sustained, *Stone v. Hinds,* 541 S.W.2d 598 (Tenn.App. 1976); moreover, the burden of showing that no genuine issue of material fact exists is upon the party moving for summary judgment. *Taylor v. Nashville Banner Pub. Co.,* 573 S.W.2d 476 (Tenn.App.1978).

In this context, the record establishes that on the morning of August 10, 1979, the plaintiff's 19 month old daughter was found dead in her crib at her father's sister's home. At about the time the death was discovered, Delana Dunbar, the mother, was being discharged from the hospital having given birth to another child. The father, Donald, was requested to go to the hospital where he was advised of his daughter's death. He, in turn, requested his wife to return to the hospital. In contemplation of an interview by the defendant, acting as the County Medical Examiner, the father informed hospital personnel his wife had previously experienced a nervous breakdown and any severe emotional shock could result in a relapse. Plaintiffs' affidavits establish the information was passed on to the defendant prior to the interview. When Delana arrived at the hospital, Dr. Strimas took Donald and Delana, a nurse from the hospital and a police investigator into a small office where, according to the affidavit of Donald, defendant acknowledged his understanding that Delana had experienced nervous or mental problems in the past. Whereupon Dr. Strimas interro-

gated both plaintiffs for approximately one-half hour; the interview was recorded by the police investigator. The questions and the thrust of the interrogation were directed to Donald concerning the child's background, her behavior, habits, with particular emphasis on her living conditions, her association with relatives and their backgrounds. As the defendant exhausted this line of questioning, he stated:

> Well let me tell you somethings that we found that prompt the investigation and also I'm going to have to order an autopsy on Crystal, to find out more as to the cause of death. She, number 1 had a tear, a large tear in her rectum. And it appears like somebody had abused her, sexually.

Delana responded, according to the tape: "Oh, no. I can't stand that." (crying). Whereupon defendant stated:

> Mrs. Dunbar I'm saying that her rectum was torn quite a bit and I can't prove at this time that she was sexually abused. I think we have evidence that she was. So I think that we are going to have to call the rest of the family into headquarters and everybody is going to have to be questioned.

At that point, he pointedly inquired of Donald as to his whereabouts within the past twenty-four hours. It may be inferred from the transcript that Delana was hysterical since defendant inquired if she wanted something to calm her down, which she declined, whereupon the defendant further stated:

> I believe they are sperm cells, that I found in the rectum. And I also suspect that she was suffocated, and she did not have a crib death.

This elicited another crying outburst from Delana.

The complaint alleges as a direct and proximate result of the defendant's conduct, Delana—

> [B]ecame anxious, nervous, depressed, and unmanageable. Some six days after the Defendant's conduct as aforedescribed, she was admitted to Watauga Area Mental Health Center in Johnson City. Her condition failed to improve. Her behavior became even more erratic and on August 17, 1979, she was admitted to the Lakeshore Mental Health Institute in Knoxville, Tennessee, where she has since received periodic treatment and will require treatment for an undeterminable length of time.

The defendant filed his affidavit stating, in part, that he: "knew absolutely nothing about any prior mental or emotional condition of Mrs. Dunbar" and further stated: "At no time did I make any remarks to the child's parents or relatives outside the mere discussion of the clinical basis of my suspicions and the recommendations for a further investigation, including an autopsy." He concluded: "At all pertinent times I was acting in good faith as outlined under T.C.A. 38–712."

Plaintiffs filed the affidavit of Dr. Cleland C. Blake, a forensic pathologist and chief pathologist and director of laboratories for Lakeway Pathology Associates and Physician's Medical Laboratory in Morristown. Dr. Blake stated, based upon reasonable medical certainty, that Crystal Dunbar's death was attributable to a variation of the "crib death" theme and, as to Dr. Strimas' interrogation, stated:

> It is the opinion of the undersigned that the documented approach to the decedent's family in this particular situation was less than professionally acceptable, in that improper and cruel conclusions were drawn, which conclusions were based neither on scientific evidence, nor expert professional opinion.

And concluded:

> It would further appear that the two erroneous conclusions advanced by Dr. Strimas at the time of his investigations, and documented in writing, specifically the element of (1) sexual abuse and rectal laceration and (2) the indicated opinion of sperm on the smears to support the conclusion of sexual abuse, were entirely improper both in fact and in timing. The rarity or even impossibility of repeated anal sodomy on a 19 month old female should cause hesitation in attaching such

a label to a casual observation of a dilated anus and rectum.

■ We conclude that reasonable minds could differ as to whether the conduct of the defendant, as alleged and described by disputed material exhibits, was extreme, outrageous and intolerable in present-day society and the mental and emotional injuries alleged by plaintiffs to have resulted from defendant's conduct are serious. Accordingly, a cause of action for intentional or reckless infliction of severe emotional distress by means of extreme and outrageous conduct has been stated by this record. *Moorhead v. J. C. Penney Co., Inc.,* 555 S.W.2d 713 (Tenn.1977), and cases cited therein at page 717; *also Restatement of the Law of Torts,* 2d, § 46.[1] And as *Moorhead* aptly states at page 718:

> The standards here applicable, *i.e.*, "extreme and outrageous" and "not tolerated in civilized society," are, like "negligence" and other variable standards which are based upon the common sense of the community, primarily for application by the jury.

While plaintiffs argue defendant was acting as county coroner and had not been appointed the county medical examiner, that defendant was acting as county medical examiner in conducting the interview is not materially disputed in the record. Defendant concedes that at all pertinent times his investigative actions were ministerial functions as distinguished from a discretionary function. He insists, however, he is immune from a suit for damages under T.C.A., § 38–712.[2]

The common law distinction between discretionary and ministerial duties and the resulting immunities is well stated in *Hale v. Johnston,* 140 Tenn. 182, 203 S.W. 949 (1918):

The authorities seem to be in accord to the effect that public officials, who owe the performance of a ministerial duty to a particular individual, are liable to one injured as the proximate result of their nonfeasance or misfeasance in the performance of such duty. Where the duty is absolute, certain, and imperative, and is simply ministerial, the officer is liable in damages to any one specially injured, either by his omitting to perform the task or by performing it negligently or unskillfully. On the other hand, where his powers are discretionary, and to be exerted or withheld according to his own judgment, he is not liable to any private person for a neglect to exercise those powers, nor for the consequences of a willful exercise of them, where no corruption or malice can be imputed to him, and he keeps within the scope of his authority. 140 Tenn., at 197, 203 S.W. 949.

■ Under *T.C.A.*, § 38–709, the duty to investigate the circumstances of a death where a death is reported under suspicious, unusual or unnatural circumstances, devolves upon the county medical examiner and is ministerial in nature. *T.C.A.*, § 38–712, grants a qualified immunity to the medical examiner. He is immune from suits for damages based on his performance of statutory duties as long as he performs in good faith. Accordingly, the qualified statutory immunity is an affirmative defense available if the medical examiner has acted in good faith. *See Jones v. Perrigan,* 459 F.2d 81 (6th Cir. 1972). The U. S. Supreme Court in *Gomez v. Toledo,* 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980), elaborates on the efficacy of good faith immunities:

> [W]hether such immunity has been established depends on facts peculiarly within the knowledge and control of the defendant. Thus we have stated that "[i]t is the

---

1. *See* comments, particularly e. and f. Comment f., in pertinent part, states: "The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or emotional condition or peculiarity."

2. *T.C.A.*, § 38–712. *Persons performing examinations and autopsies immune from suit for damages.*—Persons who in good faith perform medical examinations and autopsies under the provisions of this chapter shall be granted immunity from civil suits for damages in performing the authorized services.

existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct." [Citation omitted.] The applicable test focuses not only on whether the official has an objectively reasonable basis for that belief, but also on whether "[t]he official himself [is] acting sincerely and with a belief that he is doing right," . . . [3]

■ The tort of outrageous conduct is described as an intentional or reckless infliction of severe emotional distress by means of extreme or outrageous conduct, *Moorhead, supra; Restatement of the Law of Torts*, § 46; Prosser, *The Law of Torts*, § 12, (4th ed. 1971),[4] and the Western Section of this court has recognized that outrageous conduct is a higher degree of misconduct than willful and wanton misconduct. *Johnson v. Woman's Hospital*, 527 S.W.2d 133, 142 (Tenn.App.1975). We conclude the pleadings and affidavits raise a disputed issue of material fact as to the good faith performance of the statutory duties by the defendant. *See Idlehour Development v. City of St. Charles*, 88 Ill.App.3d 47, 42 Ill.Dec. 929, 409 N.E.2d 544 (1980).[5]

■■ There are also allegations of medical malpractice and slander in the complaint which the trial judge held not to be actionable. We agree. There is no physician-patient relationship established by this record as defined in *Osborne v. Frazor*, 58 Tenn. App. 15, 425 S.W.2d 768 (1968). The averments are not actionable under *T.C.A.*, § 29–26–102(6), and the plaintiffs' issue as to the trial court's dismissing the slander allegations is meritless.

The trial court's judgment to the extent stated herein is reversed and the cause remanded to the trial court for further proceedings. Costs of the appeal are assessed to appellee.

SANDERS and GODDARD, JJ., concur.

---

**3.** For other cases discussing good faith immunities, *see Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Chagnon v. Bell*, 642 F.2d 1248 (D.C. Cir.1980); *Neal v. Donahue*, 611 P.2d 1125 (Okl.1980); *Scarpaci v. Milwaukee County*, 96 Wis.2d 663, 292 N.W.2d 816 (1979); *Stath v. Williams*, 367 N.E.2d 1120 (Ind.App.1977).

**4.** Prosser states: "[S]omewhere around 1930 it began to be recognized that the intentional infliction of mental disturbance by extreme and outrageous conduct constituted a cause of action in itself." At p. 56.

**5.** *Idlehour* holds a plea of good faith immunity is not a defense as a matter of law to a complaint based on allegations of a tort of an intentional and malicious nature.