**Robert N. GANN, Sr., and wife, Ruth Gann, Plaintiffs–Appellants,**

v.

**David L. KEY and Raymond Holsberry, Defendants–Appellees.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

June 22, 1988.

Permission to Appeal Denied by Supreme Court Sept. 26, 1988.

William Vest, Hendersonville, Tenn., for plaintiffs-appellants.

Cornelia A. Clark, Nashville, Tenn., for defendants-appellees.

## OPINION

TODD, Presiding Judge.

This is a suit for outrageous conduct in which the plaintiffs have appealed from a summary judgment for the defendants.

The sole issue on appeal is the correctness of the summary judgment.

The plaintiffs are the parents of Robert N. Gann, Jr., who was shot to death on January 9, 1986. The defendants are members of the Hendersonville Police Department. Plaintiffs' complaint alleges that:

"4. On or about January 8, 1986, in Sumner County, Tennessee, Defendant Key, with the guidance and assistance of Defendant Holsberry, initiated an investigation into allegations of child abuse against one Ryan Reed, who was residing at 183 Anderson Lane, Hendersonville, Sumner County, Tennessee, with his mother, Angela Reed, and fiance, Robert N. Gann, Jr., son of the Plaintiffs, who had allegedly been intentionally injured sometime prior to approximately 12:00 noon, January 8, 1986, and was ultimately taken to medical authorities and Vanderbilt Hospital by Robert N. Gann, Jr. Thereafter, Defendants launched a conspiracy of outrageous conduct and grossly unprofessional conduct solely designed to inflict extreme mental anguish, distress, anxiety, embarrassment and humiliation upon the Plaintiffs in this cause by the gross misuse of their police powers in making every effort to publicly and privately brand Robert N. Gann, Jr., as a child abuser and murderer with no facts on which to support such action and to the exclusion of all others who had opportunity, motive, physical capacity and presence to have inflicted the injuries on Ryan Reed.

"5. The conspiracy was effectuated through the following overt acts:

"a. On numerous occasions between January 8 and January 23, 1986, publicly suggesting that Robert N. Gann, Jr., had abused and ultimately murdered Ryan Reed between the hours of 8:30 and 11:30 a.m. when said Defendants were in possession of evidence and/or expert testimony that demonstrated, among other facts, that:

"(1) Genital area abuse to Ryan Reed was up to 14 days old;

"(2) Ryan Reed's head injuries were suffered as early as the hour of 11:00 a.m., Tuesday, January 7, 1986;

"(3) The unintentional death of Ryan Reed could not be excluded;

"(4) Injuries to the rear skull portion of Ryan Reed were consistent with his falling from bed as told to the Defendants by Robert N. Gann, Jr.;

"(5) That Ryan Reed suffered no sexual abuse;

"(6) That evidence of skin removal on Ryan Reed's penis and genital area was equally consistent with ice application as scalding liquid application;

"(7) That during the period, January 4, 1986 through 8:30 a.m., January 8, 1986, Ryan Reed was in the care and custody of others than Robert N. Gann, Jr., and on January 7, 1986, the exclusive care of others than Robert N. Gann, Jr.

"(8) That reported inconsistent statements of Robert N. Gann, Jr., regarding the manner in which Ryan Reed was injured had in fact been corroborated by Angela Reed;

"(9) That the T.B.I. Crime Lab had determined that presence of blood on Ryan Reed's potty chair which was consistent with Robert N. Gann, Jr.'s statement that Ryan Reed had suffered a genital injury while using said chair;

"(10) That Ryan Reed had suffered a genital injury on or about December 13, 1985, which was treated by a physician who determined no evidence of abuse;

"(11) That the police were aware that Angela Reed was knowledgeable of a recent genital injury (January 7, 1986) to Ryan Reed obtained while in custody and control of Angela Reed; and

"(12) That a $100,000 life insurance policy had been purchased on the life of Ryan Reed by Angela Reed in October, 1985.

"b. By refusing to direct their officers to retrieve and investigate physical evidence at 183 Anderson Lane that indicated the involvement and/or motive for others than Robert N. Gann, Jr., being responsible for injuries to Ryan Reed, after same was brought to their attention.

"c. By communicating to Plaintiffs on or about January 12, 1986, that their investigation was complete and was to be closed with no further investigation without fully interviewing Angela Reed, Plaintiffs or their family and others who had been identified to Defendants who had knowledge concerning the facts surrounding the death of Ryan Reed.

"d. That immediately following the death of Robert Gann, Jr., on January 9, 1986, at the hand of the father of Angela Reed, Defendants instructed their officers to 'try to get Angela Reed to say something bad about Bobby.'

"6. The conspiracy herein alleged, which continued to date, peaked on January 22, 1986, after your Plaintiffs had made repeated requests to the Defendants to cease and desist such outrageous and unprofessional conduct, when Defendant Key, again with the counsel and assistance and at the instigation of Defendant Holsberry, made repeated public statements, intentionally and outrageously disseminated to approximately 150,000 households, including your Plaintiffs, through the television, radio and print media, and again to Plaintiffs through delivery of a copy of said statements, some 10 days after Plaintiffs' son had been buried, depicting Robert N. Gann, Jr., as a child abuser and a murderer. The specific statement made was as follows:

'The suspected killer of 2½ year old Ryan Reed, who died from child abuse, had a two year history of domestic violence, according to Hendersonville Police Chief David Key. "Robert ' "Bobby" ' Gann, Jr., 23 years of age, of 183A Anderson Lane, Hendersonville, would have been charged with murder in the death of the toddler, based on circumstantial evidence and the many conflicting statements Gann gave about the injuries," Key said. However, Gann was shot to death in the waiting room of Vanderbilt Hospital less than two days after the child was admitted, apparently by the distraught grandfather of Ryan, Inglewood pharmacist Charles Jones. Metro Police are investigating Gann's death.

'Key said Gann had been suspect since the investigation began. Gann told police he used warm water on the boy's penis to make him urinate while potty training him. Ryan's genital area was burned, lacerated, bruised and swollen, according to medical reports.

'Gann and the boy's mother, Angela Reed, said it could have happened when the boy's penis got stuck while Gann was emptying the potty and that Bobby had to jerk it approximately three times to get it loose. Gann's statements as to the blow to the head, which has been determined to be the cause of death, were varied.

'Dr. Charles Harlan, medical examiner, has determined the cause of death to be the result of one or more blows to the head, rather than a fall, possibly caused by a knuckle, ring, or firm object which caused trauma to the brain, subsequently causing death.

'Key said, "Gann's statements were ludicrous. He gave four different versions to investigating officers, Miller Medical Group and Vanderbilt Hospital. Not only were they conflicting, any intelligent person could determine most of them were physically impossible."

'Other domestic violence related in police reports show that a close family member reported to police she had advised Gann to stay away from her child because she was afraid he would hurt the baby. The relative said Gann pushed her, slapped her, then pushed her down as she was holding her baby, in June of 1984, according to police reports. Gann said he was just trying to "calm her," and that it upsets him when she tells him to stay

away from the baby. A separate incident a month later was reported when a girlfriend of Gann's said he hit her in the jaw. Two weeks later, another police report was filed stating that Gann had slapped her again across the face. Investigation revealed seven other incidents where Gann was involved in physical violence with close family members. Investigation further revealed that in one of the incidents a firearm was involved. Some of the same family members making public statements in Gann's defense are ones who have experienced fear of Bobby Gann when they filed police reports over the last two years, Key said.

'Investigation revealed that the "stereo" allegedly reported to possibly have been pulled by Ryan onto his own head was found to be a child's plastic record player which Gann stated was on a toybox, investigators found to be a maximum of 23 inches from the floor. "Medical reports indicate that seven different marks to Ryan's temple and forehead were very possibly knuckle blows. This was a brutal abuse," Key said.

'Investigation into this case involved interviewing approximately (50) witnesses including Gann and Reed family members, associates, medical personnel, etc., with in excess of 300 man hours expended since January 8, 1986.

'Det. Terry Frizzell and Det. Paul Harbsmeier are to be commended for the efforts they have expended in this case.'

" . . . ."

The complaint continues:

"8. The conduct of Defendants was willful, wanton and outrageous, and their persistent actions and statements as hereinabove set forth, were made with the deliberate intention of causing Plaintiffs severe emotional distress, or were made when both knew or should have known that they would have such effect. The aforesaid acts of Defendants were further willfully, intentionally and maliciously made so as to cause the Plaintiffs to cease and desist in their repeated demands that a full, complete and impartial investigation concerning the death of Ryan Reed be performed and in an attempt to convince the public that Robert N. Gann, Jr., had indeed inflicted the injuries on Ryan Reed which had resulted in his unfortunate death, when in truth and fact, the Defendants had no evidence to support such accusations and knew said accusations to be factually unfounded.

"9. The aforesaid acts of Defendants and the manner in which they were done amounted to willful, malicious and intentionally outrageous conduct on the part of Defendants for the benefit and for the advantage of Defendants and against the interests of Plaintiffs.

"10. As a direct and proximate result of Defendants' outrageous conduct, Plaintiffs suffered extreme mental anguish, distress, and anxiety, were embarrassed and humiliated in the eyes of the public, their relatives, their neighbors, friends and business associates, became upset and nervous and disturbed in body and mind, were fearful for their reputation and have been subjected to months of vile and obscene phone calls quoting the statements of Defendant Key, and harassing mail.

"11. As a further, direct and proximate result of said acts of Defendants and each of them, both Plaintiffs have suffered resulting physical illness and the inability to sleep.

"12. Plaintiffs further allege that both Defendants knew or should have realized that their conduct involved an unreasonable risk of causing the distress ultimately inflicted upon the Plaintiffs and knew or should have known from the facts available to them that the emotional distress, if it were caused, might result in illness or bodily harm to the Plaintiffs.

" . . . ."

The defendants moved for dismissal or for summary judgment; and in support thereof, filed their affidavits. The affidavit of defendant, Key, states:

2. I am the duly appointed Chief of the Hendersonville Police Department. In that capacity I supervised an investigation into allegations of child sexual

abuse involving Ryan Reed. That investigation was commenced after a request was received by the Hendersonville Police Department from Sumner County Department of Human Services through the Sumner County District Attorney General's office on January 8, 1986. Ryan Reed died on January 10, 1986.

3. The department's investigation into allegations of child sexual abuse against Ryan Reed was primarily carried out by Detectives Terry Frizzell and Paul Harbsmeier. All of my involvement in the Ryan Reed child sexual abuse investigation and inquiry into the actions of Robert Gann, Jr. was in response to the requests made by the Sumner County Department of Human Services and the Sumner County District Attorney General. I acted in good faith in all respects with regard to that investigation.

4. At the conclusion of the investigation it was the determination of the Hendersonville Police Department that probable cause existed to arrest Robert Gann, Jr. for the abuse and death of Ryan Reed. However, on January 9, 1986, Robert Gann, Jr. was killed by Charles Jones, grandfather of Ryan Reed. Since the sole suspect turned up by the lengthy and in depth investigation was now deceased, the City of Hendersonville Police Department closed its investigation into the abuse and death of Ryan Reed.

5. On January 22, 1986, I issued a public statement outlining the scope and conclusions of that investigation. All of my statements were based upon the facts contained within the investigative file accumulated by the City of Hendersonville Police Department. It is common for the City of Hendersonville Police Department to issue a public statement with regard to the progress and closing of investigations of public interest. I believe that the Ryan Reed investigation was of great public interest.

6. Throughout the City of Hendersonville Police Department's investigation into the allegations of child sexual abuse of Ryan Reed, it was never my intention to do anything other than conduct a thorough and complete investigation as requested by the Sumner County Department of Human Services and the Sumner County District Attorney General.

. . . .

The affidavit of defendant, Holsberry, states:

2. I was the duly appointed Captain of the Hendersonville Police Department at all times relevant to this litigation and through January 2, 1987 when I resigned my position. In that capacity I supervised an investigation into allegations of child sexual abuse involving Ryan Reed. That investigation was commenced after a request was received by the Hendersonville Police Department from the Sumner County Department of Human Services through the Sumner County District Attorney General's office on January 8, 1986. Ryan Reed died on January 10, 1986.

3. The department's investigation into allegations of child sexual abuse against Ryan Reed were primarily carried out by Detectives Terry Frizzell and Paul Harbsmeier. All of my involvement in the Ryan Reed child sexual abuse investigation and inquiry into the actions of Robert Gann, Jr. was in response to the request made by the Sumner County Department of Human Services and the Sumner County District Attorney General. I acted in good faith in all respects with regard to that investigation.

4. At the conclusion of the investigation it was the determination of the Hendersonville Police Department that probable cause existed to arrest Robert Gann, Jr. for the abuse and death of Ryan Reed. However, on January 9, 1986, Robert Gann, Jr. was killed by Charles Jones, grandfather of Ryan Reed. Since the sole suspect turned up by the lengthy and in depth investigation was deceased, the City of Hendersonville Police Department closed its investigation into the abuse and death of Ryan Reed.

5. On January 22, 1986, Police Chief David L. Key issued a public statement outlining the scope and conclusions of

that investigation. All of his statements were based upon the facts which I know to be contained within the investigative file accumulated by the City of Hendersonville Police Department. It is common for the City of Hendersonville Police Department to issue a public statement with regard to the progress and closing of investigations of public interest. I believe that the Ryan Reed investigation was of great public interest. I did not issue any public statements concerning the Ryan Reed investigation.

6. Throughout the City of Hendersonville Police Department's investigation into the allegations of child sexual abuse of Ryan Reed, it was never my intention to do anything other than conduct a thorough and complete investigation as requested by the Sumner County Department of Human Services and the Sumner County District Attorney General.

. . . .

A press release dated January 23, 1986, is in the record, and its contents conforms substantially with the news report quoted in the complaint.

Before discussing the evidence offered by plaintiff, it will be useful to review the existing authorities on the subject of the nature and elements of an action for outrageous conduct and to determine the nature of evidence required to show a disputed issue of fact to preclude a summary judgment in this case.

In *C.D. Swallows v. Western Electric Company, Inc.,* Tenn.1976, 543 S.W.2d 581, a suit was filed for severe physical and emotional harm resulting from alleged outrageous conduct and invasion of privacy consisting of threatening by mail, investigation of private life, attempts to discipline plaintiff at his place of employment, an intention to "get" plaintiff and to see that plaintiff's employment was terminated. The trial court dismissed for failure to state a claim for which relief can be granted. The Supreme Court affirmed and said:

Liability for the tort of "outrageous conduct" exists only where (1) the conduct of the defendants has been so outrageous in character, and so ex-

treme in degree, as to be beyond the pale of decency, and to be regarded as atrocious and utterly intolerable in a civilized society, and (2) the conduct results in serious mental injury. *Medlin v. Allied Investment Co.,* 217 Tenn. 469, 398 S.W. 2d 270 (1966). "'The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities.'" Restatement of Torts(2d), § 46, comment (d), quoted with approval in *Medlin,* supra 398 S.W. 2d at page 274.

In *Martin v. Senators, Inc.,* 220 Tenn. 465, 418 S.W.2d 660 (1967), assuming the existence of the common law right of action for invasion of privacy, this court pointed out a condition engrafted on the action, in that:

[L]iability (for invasion of privacy) exists only if the conduct is such that a defendant should have realized it would be offensive to persons of ordinary sensibilities; and that *it is only where the intrusion has gone beyond the limits of decency that liability accrues....* (emphasis supplied.)

The Tennessee Rules of Civil Procedure, while simplifying and liberalizing pleading, do not relieve the plaintiff in a tort action of the burden of averring facts sufficient to show the existence of a duty owed by the defendant, a breach of the duty, and damages resulting therefrom. The complaint in this action is replete with conclusions couched in the language of *Medlin,* supra, but does not undertake to describe the substance and severity of the conduct of appellee's employees which allegedly amounted to harassment, not the substance and severity of the conduct of Pinkerton in its investigations, nor the actions of Western Electric in attempting to discipline appellant. And, as was pointed out in *Medlin,* "it is not enough in an action of this kind to allege a legal conclusion; the actionable conduct should be set out in the [complaint]," supra 398 S.W.2d at page 275. This is so because the court has the burden of determining, in the first instance, whether appellees' conduct may reasonably be regarded as so ex-

treme and outrageous as to permit recovery or whether the conduct is such as to be classed as "mere insults, indignities, threats, annoyances, petty oppression, or other trivialities," for which appellees would not be liable. See comments to § 46 of the Restatement of Torts, Second.

. . . .

543 S.W.2d at 582–583.

In *Medlin v. Allied Investment Co.*, 217 Tenn. 469, 398 S.W.2d 270 (1966), the declaration alleged that plaintiffs borrowed money from defendant, that a dispute arose as to whether certain payments were made, that defendant refused to accept a tendered payment, sent default notices and threatened foreclosure, all without justification, as a result of which plaintiff's nervous condition was aggravated, producing headaches. The Trial Judge sustained a demurrer (motion to dismiss) and the Supreme court affirmed, stating:

These factors are set out in the Restatement of Torts(2d), sec. 46, "Outrageous Conduct Causing Severe Emotional Distress".

"(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm results from it, for such bodily harm."

Clarification of this statement is found in the following comment:

"d. Extreme and Outrageous Conduct. The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct is characterized by 'malice', or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly unto-

lerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.'

"The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities."

From the foregoing portion of the Restatement, we find the two factors which must concur in order to outweigh the policy against allowing an action for the infliction of mental disturbance: (a) the conduct complained of must have been outrageous, not tolerated in civilized society, and (b) as a result of the outrageous conduct, there must be serious mental injury. Stated another way, there are two valid policies fighting for recognition; the interest in a judicial climate which does not become burdened with trivial lawsuits versus the interest a person has in being free from unreasonable emotional disturbance. The result of this policy conflict has been somewhat of a compromise. The law has developed to the extent that the personal interest in peace of mind is protected from "outrageous" interference which results in substantial emotional damage, and at the same time the policy of protecting the judicial process from trivial claims has been protected by disallowing claims which are not founded on conduct which can be characterized as "outrageous." [See complete annotation in 64 A.L.R.2d 100]. This approach gives limited protection to the interest in emotional tranquility.

The declaration of the plaintiffs is insufficient because the plaintiffs have not alleged a course of conduct on the part of the defendant which could be classed as outrageous. It is not enough in an action of this kind to allege a legal conclusion; the actionable conduct should be set out in the declaration. The defendant's conduct, as set out in the declaration shows that the defendant was negligent in keeping his records and that because of this negligence, he

caused two notices of default to the Medlins. He was abusive to Mrs. Medlin on the telephone, but the substance and severity of the abuse is not set out in the declaration, therefore we cannot ascribe the term "outrageous" to this alleged abuse.

. . . .

217 Tenn. at 478–480, 398 S.W.2d 270.

In *Johnson v. Woman's Hospital,* Tenn. App.1975, 527 S.W.2d 133, the plaintiffs obtained a verdict and judgment against the hospital for display of the deceased body of the premature child of the plaintiffs. This Court affirmed. Quoting from *Medlin v. Allied Investment Co.,* supra, this Court concluded:

■ As to the outrageous conduct theory we hold that there is evidence from which a jury could find that the conduct of the defendant hospital in displaying the infant in the manner and under circumstances described was outrageous conduct as defined by our Supreme Court in the Medlin case, supra, and that such conduct recklessly caused severe emotional distress to plaintiff Mrs. Johnson. We are of the opinion that a recitation of the foregoing facts could be considered to cause the exclamation of "outrage!" from the general community.

. . . .

527 S.W.2d at 140.

In *Moorhead v. J.C. Penney Co. Inc.,* Tenn.1977, 555 S.W.2d 713, the Trial Judge dismissed for failure to state a claim for which relief can be granted where the complaint averred a mistake in bookkeeping, followed by failure to correct it, 42 threatening letters, and bills, and reference of the claim to a collection agency, all in spite of repeated remonstrances of plaintiffs, admissions of error and promises to correct the error. The Supreme Court reversed and said:

■ We hold that the foregoing allegations state a cause of action for intentional or reckless infliction of severe emotional distress by means of extreme and outrageous conduct. (citing authorities.)

. . . .

■ In our view, a jury could reasonably conclude that the conduct of the defendant, considered as a whole, was extreme, outrageous and intolerable in present day society; and, that the mental and emotional injuries alleged by the plaintiffs to have resulted from defendant's conduct are serious. In reaching this conclusion we consider certain aspects of the defendant's conduct, as alleged, to be especially significant. First, is the fact that defendant's threatening letters, telephone calls, etc., continued long after defendant had acknowledged that its accounts were in error and that plaintiffs owed it nothing. The fact, if it be a fact, that the personnel of the defendant's collection department did not possess the knowledge, which admittedly was possessed by those in another of its departments, that the alleged debtor did not in fact owe defendant anything is no matter of defense; such knowledge of the one department is imputed to the corporate entity, the principal, and its liability must be determined accordingly. Next, we regard as significant (1) the long duration of defendant's course of conduct which is alleged by the plaintiffs to be "for more than one year" and (2) the volume of the threatening letters and bills, alleged to be "some 42" in number. Finally, we regard as significant the threats to deliberately injure the plaintiffs' credit reputation and jeopardize their job security.

. . . .

555 S.W.2d at 717.

In *Dunbar v. Strimas,* Tenn.App.1981, 632 S.W.2d 558, the Trial Judge granted summary judgment of dismissal where there was evidence that the defendant, a county medical examiner, after being informed of plaintiff's delicate emotional condition, questioned her about the living conditions of her 19 month old daughter who had been found dead in her crib after which he informed plaintiff that he had found evidence of severe sexual abuse of the child. This Court held that the pleadings and affidavits, raised a disputed issue of material fact as to good faith performance

of the defendant as county medical examiner and said:

█ We conclude that reasonable minds could differ as to whether the conduct of the defendant, as alleged and described by disputed material exhibits, was extreme, outrageous and intolerable in present-day society and the mental and emotional injuries alleged by plaintiffs to have resulted from defendant's conduct are serious. Accordingly, a cause of action for intentional or reckless infliction of severe emotional distress by means of extreme and outrageous conduct has been stated by this record. (citing authorities.)

. . . .

The common law distinction between discretionary and ministerial duties and the resulting immunities is well stated in *Hale v. Johnston,* 140 Tenn. 182, 203 S.W. 949 (1918);

The authorities seem to be in accord to the effect that public officials, who owe the performance of a ministerial duty to a particular individual, are liable to one injured as the proximate result of their nonfeasance or misfeasance in the performance of such duty. Where the duty is absolute, certain, and imperative, and is simply ministerial, the officer is liable in damages to any one specially injured, either by his omitting to perform the task or by performing it negligently or unskillfully. On the other hand, where his powers are discretionary, and to be exerted or withheld according to his own judgment, he is not liable to any private person for a neglect to exercise those powers, nor for the consequences of a willful exercise of them, where no corruption or malice can be imputed to him, and he keeps within the scope of this authority. 140 Tenn., at 197, 203 S.W. 949.

█ . . . The U.S. Supreme Court in *Gomez v. Toledo,* 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980), elaborates on the efficacy of good faith immunities:

[W]hether such immunity has been established depends on facts peculiarly within the knowledge and control of the defendant. Thus we have stated that "[i]t is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct." [Citation omitted.] The applicable test focuses not only on whether the official has an objectively reasonable basis for that belief, but also on whether "[t]he official himself [is] acting sincerely and with a belief that he is doing right," . . .

█ The tort of outrageous conduct is described as an intentional or reckless infliction of severe emotional distress by means of extreme or outrageous conduct, (citing authorities), and the Western Section of this court has recognized that outrageous conduct is a higher degree of misconduct than willful and wanton misconduct. (citing authorities) We conclude the pleadings and affidavits raise a disputed issue of material fact as to the good faith performance of the statutory duties by the defendant. (citing authorities.)

. . . .

632 S.W.2d at 561–562.

█ It is seen from the foregoing that damages may be recovered for serious emotional distress *intentionally* or recklessly inflicted by *outrageous* conduct which exceeds in degree willful and wanton misconduct.

In each of the authorities cited above, the alleged outrageous conduct consisted of acts or words directly and specially communicated to the injured party. In the present case the acts or words did not occur in the physical presence of plaintiffs nor were they specially directed toward plaintiffs as by mail. Nevertheless, it is reasonable to concede that the use of public communication, such as the news media, would not immunize one who intentionally or recklessly inflicts serious emotional distress by acts or words which constitute outrageous conduct.

Plaintiff's brief asserts:

Plaintiffs, in this suit, are not challenging the manner in which the Reed/Gann investigation was conducted or the actions of the investigating officers, or the manner in which the investigation was supervised.

Plaintiffs have brought this suit alleging that Defendants conspired to and did *intentionally* inflict grievous emotional and mental distress upon them by virtue of their outrageous conduct by Defendants publicly accusing, in the presence of Plaintiffs, their *recently deceased* son of murder and child sexual abuse, when Defendants knew or should have known the allegations were untrue, without basis in fact, that Plaintiffs were particularly susceptible to harm and from such statements; *Defendants intended to and did harm Plaintiffs.* (emphasis supplied.)

It appears that the defendants admit that the news release alleged in the complaint did occur. It also appears that the defendant, Key, admits that he was responsible for the release. It appears that defendant, Holsberry, denies under oath the actual release of the statement to the news media by him. It also appears that both defendants assert under oath that the matters contained in the news release represented the bona fide conclusions of the Hendersonville Police Department based upon the information contained in the investigatory files of the department. It also appears that both defendants deny under oath any intention to inflict injury upon the plaintiffs and assert affirmatively their good faith in all actions taken by them.

The foregoing being true, the burden rests upon the plaintiffs to contradict the affidavits of defendants by producing some relevant and material evidence which would justify a jury in finding:

a. That defendant Holsberry had a culpable part in the news release of which complaint is made.

b. That the news release was made by either or both of the defendants with intent to do serious emotional injury to the plaintiffs, or with such recklessness as to impute such an intent.

c. That the news release under the circumstances constituted "outrageous conduct."

d. That the news release produced serious injury to plaintiffs.

It is the duty of plaintiffs to present in their written argument each fact that supports their position, with citation to the record where evidence of such fact is recorded. Rule 6(a)(4) Rules of this Court.

Plaintiffs' written argument states:

(a) Plaintiffs allege bad motive on the part of defendants in wanting to cause them harm and to destroy their business in Hendersonville (Robert Gann Dep., pgs. 6–15, 43)

The cited portion of the referenced deposition contains the following pertinent testimony of the plaintiff, Robert N. Gann:

THE WITNESS: I have not read the police report but, of course, I've seen on television what David Key said. And I have also read what he came out and said without any evidence whatsoever that my son had done anything. I feel like in that matter they were out to get me out of business because I gave him and the City of Hendersonville Police Department quite a bit of problems during the 15 years or so I'd been over there.

. . . .

A. And I managed to succeed without them. My business was a success contrary to what the Police Department didn't want it to be.

. . . .

Q. . . . Is there anything specific about Ray Holsberry that caused you to file this second suit?

A. Basically the same, because he's as much as of a boss over there if not more so than David Key.

. . . .

A. I base the lawsuit on what I did see on TV, knowing indirectly it came from Captain Holsberry and David Key and Frizzell and Harbsmeier.

. . . .

A. Well, the fact that I opened up a wrecker service against another wrecker company up there that was where all the

police had their cars fixed and he backed him on everything as far as that. I consequently had to go to Court. No, I'm sorry, I didn't go to Court, I threatened him to go to Court in an offset and they didn't; I had a Commissioner too that was a friend of mine that forced the Commission to put me on as long as I could comply, and I helped draft the rules and regulations in that particular incident which I did comply with and which I did go on the wrecker calls.
Q. When were these rules and regulations passed that you helped to draw up?
A. I honestly don't know. It's been—it was before he was the Chief. Let me say that, okay?

. . . .

A. I know it was in the 70's, '73 or '74. No, it wasn't it was '75 or '76.

. . . .

Q. ... Did Mr. Holsberry make any statements himself on TV that you're relying on in this lawsuit?

. . . .

A. (The Witness) That I know of, no.
Q. (By Ms. Clark) All right. And apart from the January 23, 1986 press conference that Chief Key has already testified about, did you see him or are you aware of any other statements he made to the press that you're relying on?
A. No statements other than to the press.
Q. And are we primarily looking at the January 23, 1986 conference and statement?
A. I would say that would be true.

. . . .

Q. Okay. You have heard David Key and Ray Holsberry testify that they did not have any personal problems with you, that they were called to general business dealings but didn't recall them negatively. Can you tell me about your personal feelings or relationships with the two of them?
A. ... I moved in and bought the wrecker service back, the wreckers and things. And I immediately went to the police station to see David, you know, and went to see him and said, "I'd like to get my wreckers back on the list." They were on a list. He took them off. I mean, when I bought them he cancelled them. And I said, "I'd like to get back on the list."

. . . .

... So I went into David's office and said, "You know, David, I've got an attorney now. Do you want to do it and put me on or do you want to do through Court? Either way it's great with me, I don't care." He said, "Me and you aren't going to get along." I said, "I didn't come here to get along with you. I came here to get back in business." ...
Q. Have you had any other conversations with Chief Key since that time that you consider unpleasant?
A. Not specifically. I have nothing against Chief Key.

. . . .

Q. What about Mr. Holsberry, can you tell me what your general relationship with him was?
A. We were friends at one time.
Q. When was that and why did it change?
A. On some car repair, and I don't remember the year. There again, I don't remember that.

■ On page 15 of the deposition are four questions beginning with the words, "Is it your position that...." The answers to such questions are not factual but are opinions and are not to be considered in evidence on motion for a summary judgment.

■ No other evidence is found in the cited portion of the record which is relevant to plaintiff's allegation of "bad motive", "wanting to cause them harm and to destroy their business."

The cited portion of the record contains testimony that Mr. Gann "feels like" they were out to get him out of business because he had given the police department problems; that Holsberry was sued because he is as much boss of the police department as Key; that he (Gann) opened a wrecker service in competition with a service patronized by the police and forced

the police department to "put him on the list"; that this occurred in 1975 or 1976, that he has had no personal problems with Key or Holsberry except that during his efforts to get "on the list" he threatened Key with a lawsuit and Key responded, "Me and you aren't going to get along," and that he had a disagreement with Holsberry about a repair to a vehicle of Holsberry's son.

Motions for summary judgment are decided under the same criteria as motions for directed verdict. *Dickerson v. Sanders Mfg. Co.*, Tenn.App.1983, 658 S.W.2d 535; *Berry v. Whitworth*, Tenn.App.1978, 576 S.W.2d 351.

A court is not justified in refusing to direct a verdict on a mere scintilla of evidence to sustain the plaintiffs' theory of the case. *Western & Atlantic R.R. v. Land*, 187 Tenn. 533, 216 S.W.2d 27 (1949); *Bowers v. Potts*, Tenn.App.1981, 617 S.W. 2d 149; *Moon v. Johnston*, 47 Tenn.App. 208, 337 S.W.2d 464 (1960); *Cude v. Culberson*, 30 Tenn.App. 628, 209 S.W.2d 506 (1948).

There is no evidence of participation in the news release by Raymond Holsberry.

The cited evidence is not sufficient to support plaintiffs' allegation of intent to do serious injury to plaintiffs and would not support a jury finding to this effect. Likewise there is no evidence of acts of such nature as would ipso facto impute to either defendant a deliberate intent to do injury to plaintiffs.

Plaintiffs argue that there is a dispute as to the truthfulness of the statement released on January 22 or 23, 1986, quoted above. The evidence cited by plaintiffs raises an issue as to the soundness of the opinions expressed in the news release, but they do not raise an issue as to whether the expression of the opinions was outrageous conduct. Assuming the truth of all facts shown by the evidence cited, no basis is established thereby for a finding that the publication of the news release constituted outrageous conduct. Truth or falsity is an issue in a libel or slander case, but this is not a libel or slander case. If it were a libel or slander case, the right of action would have abated at the death of the subject of the libel or slander. T.C.A. § 20–5–102; *Akers v. Akers*, 84 Tenn. (16 Lea) 57, 57 Am.R. 207 (1885). There is no evidence which would support a finding of such blatatant and deliberate falsehood as would support a finding of intentional or reckless harm by outrageous conduct.

■ Plaintiffs next argue that:

The case at bar demands the trier of fact to test the witnesses.

In order to establish grounds for a trial on the merits, plaintiff's must offer some evidence of malicious intent or reckless and outrageous conduct. Such has not been produced by plaintiffs. It is not sufficient to "challenge the veracity" of the affidavits supporting defendants' motion. Sworn evidence of facts must be met with contradictory sworn evidence of facts.

If the evidence presented by the moving party is not contradicted by the opposing party by sworn evidence or record admissions of adversary, and if the uncontradicted evidence relied upon by the moving party is sufficient to entitle the moving party to judgment as a matter of law, then summary judgment for the moving party is in order. *Read v. Thomas*, Tenn.App. 1984, 679 S.W.2d 467.

Plaintiffs argue that they suffered "grievously, mentally, emotionally, and ultimately physically" because of defendants. There is evidence indicating regrettable effects upon plaintiffs, but said effects as are shown do not constitute such extreme and devastating effects as to create a case of outrageous conduct merely by force of its extreme effect.

In short, the evidence offered by plaintiffs, viewed in the light most favorable to them, does not establish a situation so extreme in degree as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community and to cause an average member of the community to exclaim "Outrageous".

The judgment of the Trial Court is affirmed. Costs of this appeal are taxed against plaintiffs. The cause is remanded for such further proceedings, if any, as may be necessary and proper.

AFFIRMED AND REMANDED.

CANTRELL, J., and LLOYD TATUM, Special Judge, concur.