**Mrs. Effie ALSUP et al., Appellees,**

**v.**

**Thomas Osmond MONTOYA et al., Appellants.**

Supreme Court of Tennessee.

Dec. 18, 1972.

——————◆——————

A. L. Todd, Jr., Matt B. Murfree, III, Todd & Murfree, Murfreesboro, for appellants.

Ewing Smith, Smith & Sellers, Murfreesboro, for appellees.

### OPINION

ERBY L. JENKINS, Special Justice.

This is an action brought by devisees under the will of W. C. Alsup to have certain lands devised under the will sold and the proceeds reinvested for the benefit of the life tenants and contingent remaindermen.

W. C. Alsup died, and his will was probated, in 1920. By that will he devised to each of his three daughters, for and during their lives, a farm of approximately two hundred acres. The will further provided that:

"These tracts of land I devise to my daughters for and during the periods of their natural lives, and after their deaths, they are *to go to their children*, or the heirs of any child who may then

be dead, the heirs of any child who may then be dead to represent its parent and take his or her share of said land. If either of my daughters should die leaving no children and no issue of their bodies, then the tract of land herein devised to her will go to her sisters, or the heirs of any sister who may then be dead, said heirs to represent said sister and take her share of said lands.

"The land herein devised to my daughters shall not be sold or alienated *during their lives* and no court shall sell the same for reinvestment or alter the situation of said land as it exists today, it being my purpose that it shall not be sold in any way whatever." (Emphasis ours.)

The complainants in this case are the three daughters of ˌW. C. Alsup. Also joined as complainants are the two adult children of one daughter, Mrs. Martha Virginia Alsup Ritland. The other two daughters, Susan Rebecca Alsup and Miriam Katherine Alsup, now sixty-two and fifty-seven years old respectively, are unmarried and have no issue. Joined as defendants are the minor children of Mrs. Ritland's daughters. The defendants are sued individually and as representatives of the class of possible remaindermen under the will.

The theory of the original complaint is that "due to material change in conditions, the restraint upon alienation . . . should be abrogated and set aside" under the inherent powers vested in a court of equity. By an amended complaint it is also contended that the restraint upon alienation was void ab initio.

The case was tried in the Chancery Court upon stipulations of fact. As fairly summarized in the complainants' brief, the stipulations show that since 1924 the entire family has lived in California. The family did not inherit the testator's agricultural love. The land has been rented out or share-cropped for more than fifty years.

For a long time a benevolent Federal Government had it in the "Soil Bank," allowing it to lie fallow, paying yearly "rent" thereon, a questionable practice not only for the economy of the country but also the morale of the people. The buildings are antiquated and would require extensive repair, and some of the fences are in need of rebuilding. Some of the land has been heavily cropped over the years and has deteriorated in fertility and productivity. The farms are located in a strictly agricultural section of the county and would sell, even in their present condition, for an amount considerably in excess of $100,000.-00. The income to the life tenants is considerably less than a reasonable return based on the present market value of the land.

Upon hearing of the cause the Chancellor found there had been a material change in conditions which could not have been foreseen by Mr. Alsup at the time the will was executed; that due to this material change it was in the best interest of all the parties, especially the ultimate remaindermen, that the land be sold for reinvestment, and that, accordingly, this restraint on alienation was no longer valid. From the Chancellor's decree ordering a sale of the land the defendants bring this appeal.

The defendants, by their guardian ad litem, make essentially three contentions on appeal. First, that the restraint on alienation is valid; second, that the Chancery Court had no power to remove the restraint because of a change in conditions, or because it might be in the best interests of the life tenants or remaindermen; and, third, that there was in any event no evidence or stipulation of fact that the removal of the restraint on alienation would be in the best interest of the contingent remaindermen.

The defendants rely principally upon the case of Keeling v. Keeling, 185 Tenn. 134, 203 S.W.2d 601 (1947), for the proposition that the restraint upon alienation is valid.

In that case the testatrix had devised a "little house" to her nephew and his children, providing further that the nephew was not to sell it, and that if he should not use it as a home, it was to be "rented and kept up and he and his children to have the rents therefrom." The Court held that the nephew took a life estate, and his children took vested remainders subject to partial divestment by afterborn children. The life estate, however, was to be held by the nephew "for the *use and benefit of himself and his children.*" 185 Tenn. at 143, 203 S.W.2d at 605 (emphasis added). The Court held the restraint on alienation to be valid, saying:

"We can find no exception to the rule that conditions subsequent preventing alienation of an estate in fee, even for a limited time, are universally held void as inconsistent with the incidents and nature of the estate devised and contrary to public policy." [citing authorities]

"But restrictions by conditions subsequent or conditional limitation, even if they be absolute restraints upon alienation, are generally held valid if annexed to *an equitable estate not greater than a life estate.*" 185 Tenn. at 139, 203 S.W. 2d at 603 (emphasis added).

It is clear that the Court in Keeling v. Keeling was dealing with the validity of a restraint upon alienation annexed to an equitable estate. The nephew held a legal life estate in the property, of course, but he held it as trustee for himself and his children. This is a situation clearly different from a similar restraint upon the alienation of a purely legal estate. The restraint upon the power to alienate the trust estate, while valid, was nevertheless subject to the well-recognized power of a court of equity to order a sale when circumstances unforeseen by the testator render it likely that otherwise the primary purpose of the trust would be defeated. Weakley v. Barrow, 137 Tenn. 224, 192 S. W. 927 (1916); Henshaw v. Flenniken,

183 Tenn. 232, 191 S.W.2d 541, 168 A.L.R. 1010 (1945); Lenow v. Arrington, 111 Tenn. 720, 69 S.W. 314 (1902).

While there is no case in Tennessee directly passing upon the validity of a restraint upon alienation annexed to a legal life estate, the law generally is clear that any restraint which undertakes to wholly remove the power of a life tenant to alienate his estate is absolutely void. Restatement of the Law of Property, § 405; 6 American Law of Property, § 26.49 (J. Casner Ed.1952); 6 Powell, Real Property ¶844 (1971).

We can see no reason to depart from this nearly unanimous view of the law. A testator, or the settlor of a nontestamentary trust, if he so desires, may still through the medium of a trust restrict the power of his trustee to sell or otherwise alienate the property which he has devised or given. And, in such a case, the devise or gift is subject to the constant supervision of courts of equity, which are empowered, if conditions so warrant, to decree a sale of the property when necessary to effectuate the intention of the testator.

■ The overriding issue is, what did the creator of this estate wish? What were his desires when the will was made, and what would his desires be under the conditions as exist today?

Although we do not necessarily concur, it has been written that "The only authentic evidence . . . which we have of the survival of life after death is the ability of the judges to read the intention of the testator long after he has been buried," and it may come to pass that a group of ghosts of dissatisfied testators may wait on the other side of the River Styx or on the Golden Shore to "receive" this and other courts who have construed their wills; however, under the circumstances, we cannot permit the writing of a dead hand of over fifty years, from the silent tomb, to control the action of this Court in this case.

When this will was made, the testator had three daughters, and three farms. His paramount desire, no doubt, as is the desire of so many men of wealth, was to protect his loved ones insofar as he could do so. But in trying he went too far. He could not look into the future and envision the changed conditions of over half a century. He desired to protect his children from all who descend upon those who come into wealth. He had made his living by farming and he felt that they would live on these farms, raise their children who would also be farmers.

Let us for a moment, in our mind's eye, witness his reaction to this situation, if he could be "materialized and view the present situation on his return to earth."

First of all, he would no doubt be disappointed that they all had forsaken the land and moved to far-away California, a place he had heard of, but probably never seen. Then, as he rides over his once fertile acres and takes a look at his once proud farms in their run-down condition, he probably would want to remake his will, but he cannot do that now. He sees once lush producing acres now grown up and cropped up to death, stately beautiful houses and great barns, falling in decay and disrepair. If he were not a very devout man, we can imagine some of his torrid words and exclamations.

Then, too, it would be hard for him, a rugged individualist, to understand the philosophy of a paternalistic government that pays a farmer not to farm under the guise of a soil bank, the only bank he ever heard of being one where money is kept.

And we can imagine, after surveying all that had happened, the condition that the land and the buildings are in, he would say, "Judge, times have changed. Do the best you can under the changed circumstances. I tried and made a mistake." And then, taking a last look around, he would mount his horse, and ride into the

sunset and the great beyond, a land to where we are all hastening and where he has spent over half of a century, and as he rides off, we can hear him say, "I am better here."

We, therefore, hold the restraint upon alienation in his case to be invalid.

Although such a holding makes it unnecessary to discuss the other assignments of error made by the defendants, it cannot fully dispose of the case. The restraint being void, the life tenants are, of course, free to sell their estates. But the complainants have sought by this suit the sale of the entire fee, and not the sale of the life interests only.

■ Our law is clear, however, that a chancery court has wide discretion and the inherent power to order a sale for reinvestment, such as is being sought here, provided that the sale is manifestly advantageous to the interests of all the parties. Carter v. Carter, 144 Tenn. 628, 234 S.W. 764 (1921); Delk v. Williams, 10 Tenn. App. 246 (1929); Gibson's Suits in Chancery, § 1018 (5th Ed.).

■ Although the chancellor's decree below was concerned with the avoidance of the restraint upon alienation, it was based on his finding that a sale of the property was "to the manifest interest of the parties and especially to the manifest interest of the ultimate remaindermen. . . ." This finding is in our opinion fully supported by the stipulated facts which were summarized above.

We, therefore, find that the decree for sale and reinvestment was proper, and the case must be in all respects affirmed.

DYER, C. J., and CHATTIN and Mc-CANLESS, JJ., concur.

CRESON, J., not participating.