Lisa Hawkins PHILLIPS, et al., Plaintiffs–Appellees,

v.

Samuel Scott TAYLOR, et al., Defendants–Appellants.

Court of Appeals of Tennessee, Eastern Section.

Jan. 24, 1992.

Permission to Appeal Denied by Supreme Court May 4, 1992.

Thomas R. Grayson and George T. Wright, Grayson, Hawkins & Wright, Mountain City, for defendants-appellants.

William J. Cockett, Smith and Cockett, and Janice H. Russell, Mountain City, for plaintiffs-appellees.

## OPINION

SANDERS, Presiding Judge, Eastern Section.

The Defendant has appealed from a chancery decree finding him liable to the trust estate, of which he was Trustee, for failure to sell real estate, which was the primary corpus of the trust estate, and invest the proceeds in more productive securities, and also holding the Defendant liable for outrageous conduct for not being more responsive to the needs of the beneficiaries of the trust.

Harry Hawkins died testate in Johnson County in 1979. At the time of his death the principal part of his estate was comprised of an undivided interest in seven tracts of land containing a total of approximately 350 acres which he owned as tenants in common with his two nephews, Defendant–Appellant Samuel Scott Taylor and Eric Taylor. The property was all farm land located in the 1st Civil District of Johnson County and the tracts varied in size from approximately 100 acres to five acres and at the time of Harry's death were farmed in partnership between Harry Hawkins (Harry) and Defendant Samuel Taylor (Samuel). The properties were originally acquired by C.N. Hawkins around the turn of the century and had passed by descent and distribution or by will to Harry, who was the son of C.N., and to Samuel and Eric, who were his grandsons.

At the time of Harry's death he was survived by his widow, Plaintiff–Appellee Lois Fritts Hawkins, who was 47 years of age, and his daughter, Plaintiff–Appellee Lisa Hawkins (now Phillips), who was 13 years of age. Harry's will left all of his property in trust to his brother, Frank Hawkins, as Trustee, directing "[T]he Trustee shall pay to or for the benefit of my wife, Lois Fritts Hawkins, and my daughter, Lisa Hawkins, the entire net income of my estate, or so much thereof as the said Trustee may, in his sole discretion, deem necessary, in monthly, quarterly, semi-annual, or annual installments, until my wife should remarry and/or until my child shall have attained twentyone years of age." He also named Samuel as Substitute Trustee in the event Frank should predecease him. Frank did die prior to Harry's death and Samuel became Trustee.

Except for a few years during World War II Harry's livelihood was derived from farming. It appears he and his brother, Frank, were partners in the farming operation and after Frank's death he continued in a partnership with Samuel. Some time before his death Harry became afflicted with Alzheimer's disease and for the last four or five years of his life he was completely disabled and unable to work and Samuel ran the joint farming operation until Harry's death. At that time the farm land was jointly owned by Harry, Samuel, and Eric. Harry and Samuel owned, either jointly or separately, the farm machinery and cattle and maintained a joint farm checking account. The record fails to show the value of the farm equipment, cattle, and other personal property owned by Har-

ry at the time of his death, but it does show an appraisal of the value of his undivided interest in the real estate to be $102,881.

The record does not give the date on which Samuel took over the estate as Trustee but it appears to have been in August, 1980, since the record shows the checking account of the executor was transferred to the Trustee on August 16, 1980. After Samuel became Trustee, he continued the farm operation as he had operated it in Harry's lifetime, except he paid the trust estate approximately $3,000 per year as rent instead of operating on a sharecropping basis. This arrangement continued until August, 1988, when Lisa Hawkins (Phillips) filed suit in the chancery court to terminate the trust.

In her complaint, she alleged the will establishing the trust provided that upon the remarriage of Lois Fritts Hawkins, or upon Plaintiff's reaching the age of 21, the trust was to terminate and she was to receive the corpus of the trust estate. She alleged her mother had not remarried, but she became 21 on June 24, 1987, and the Trustee refused to terminate the trust. She alleged the Defendant's refusal to transfer the corpus of the estate to her had caused her financial damage and she had been forced to live at a subsistence level. The only income from the farm was the yearly rental and sale of timber in 1984. The Defendant personally rented the farm from the trust, which resulted in a conflict of interest. Plaintiff alleged the Defendant had not prudently managed the trust. The trust would have yielded more income had the Trustee converted the assets to cash many years ago. She asked that the Trustee be ordered to turn over the entire corpus and income to her or, in the alternative, the Defendant be removed as Trustee and a successor trustee be appointed and she be awarded compensatory damages.

The Defendant filed an answer joining issue on all allegations and denying he had been guilty of any mishandling of the trust estate, but saying the handling of the trust estate had been a burden for him and asking the court to relieve him and appoint another trustee as soon as he rendered a final accounting.

There followed the filing of numerous other pleadings, motions, answers, and petitions, too numerous and unnecessary to detail. They included a cross-complaint by Samuel and Eric to have the real property partitioned in kind and to have the trust estate interest set apart from their interest. Commissioners were appointed and the property was partitioned in kind.

Lois Fritts Hawkins (Lois) also filed a complaint and Lisa amended her complaint in which they alleged the Defendant breached his fiduciary duty and failed to administer the assets of the trust in a prudent manner (a) in failing to collect rents from Eric Taylor for a house in which he lived and the estate owned a 25% interest jointly with him; (b) in renting the farm land from the trust estate; (c) in failing to sell unproductive farm land; (d) in failing to convert the trust assets to cash; (e) in continuing to manage the trust assets as a farm; and (f) in commingling trust assets. They also alleged the Defendant's mismanagement of the trust assets had caused them to endure a poor standard of living and his indifference to their needs constituted a tort of negligent infliction of emotional distress. That is, outrageous conduct. They each asked for $200,000 in damages.

The Defendant, for answer, joined issue on all allegations and denied he had been guilty of any mismanagement of the trust or indifferent to the Plaintiffs' personal needs.

Upon the trial of the case the proof showed Lois and Lisa had continued to live in the same residence in which they were living at the time of Harry's death. Although they lived without luxuries, and there was some dispute in the testimony, there was evidence they had maintained about the same standard of living as they had at the time of Harry's death. Lois testified she hated to ask Samuel for money and it made her nervous to do so. She testified there were only two occasions when she did ask him for money that he told her he didn't have any. There was

very little dispute in the testimony of Samuel and Lois. Lisa, however, testified to asking him for money on occasions and did not get it. Samuel testified that the only time he could remember either of them asking for money and he did not furnish it was on an occasion when Lois asked him for $2,000 to buy braces for Lisa's teeth and the reason he did not furnish the money was because Lois had just had two operations and there was a $5,000 medical bill to be paid.

There is a transcript of approximately 500 pages of testimony in the record but what it fails to show is conspicuous. There is nothing in the record to show that Samuel failed to pay to the trust a fair and reasonable annual rental for the farm. There is no showing he ever failed to pay to the beneficiaries, or for their benefit, everything that was owed to the trust. Other than the appraisals that were made for estate tax purposes, there is nothing in the record to show the value of Harry's undivided interest in the real estate in 1980. Mr. Berlie Barry, a real estate broker in Johnson County who was one of the commissioners appointed by the court to partition the property, testified the property had increased 30% to 40% in value since 1980.

The record showed Samuel had filed no accounting as to income and expenses during the existence of the trust prior to the filing of this suit. After this suit was filed, however, he did file an accounting for each year from 1980 through 1988. The only witness to testify who was able to explain the accounting in detail was Mrs. Samuel Taylor, who did their bookkeeping and filed their tax returns. She testified that for the years 1980 through 1988 her records showed they had paid the sum of $28,000 as rent, $15,772 for the sale of timber, $5,429 from passbook and C.D. accounts, and $817.50 from the sale of land; that they had paid to the trust or on behalf of the trust a total of $56,517.85. Items paid on behalf of the trust included doctor, hospital and medical expenses, heating oil for the house, two automobiles, one for Lois and one for Lisa, and property taxes of $7,401.47. The record also showed Samuel

had not filed any fiduciary tax returns for 1980 through 1988.

The Plaintiffs called Mr. Gale Willis, a real estate broker and auctioneer of Johnson City, as an expert witness and he testified as to his opinion of the value of each of the seven parcels of land which had been assigned to the trust estate in the partition proceedings. Although he set a total value on each tract, his value was predicated on each tract's being surveyed off into smaller tracts of about five acres each and being sold as home sites. He testified that, by dividing the tracts into parcels of five acres or larger, the regular requirements for subdivisions, such as construction of streets with curbs, percolation test for septic tanks, installation of water lines, etc., could be avoided. He testified that, by dividing the property in this manner, the only requirement would be that each tract would be required to have a minimum frontage of 50 feet on a public road or street. It was his opinion that the greatest expense in preparing the property for sale in this manner would be the surveying. He estimated the total cost of the survey and sale of the property would be 10% of the sale price. He gave no estimation of the cost of roads to provide each tract with a 50-foot road frontage.

It is difficult to determine from the record what method of appraisal Mr. Willis used for fixing the value of the property, even if it were divided into small tracts. He did not use the principle of a willing seller and willing buyer; he did not check sales of comparable properties in the register's office or tax assessor's office in Johnson County; he did not testify as to cash market value. He did testify as follows: "[W]hen I appraise something I usually appraise it for what I'd give for it if I wanted it." It is also interesting to note that he did not even look at one of the parcels of land involved in his appraisal. He opined that the 162.18 acres which the commissioners assigned to the trust estate had a value in 1989 of between $168,621.50 and $178,621.50. Although the record fails to show that Mr. Willis ever saw the property prior to 1989, he opined it was worth

between $215,145.50 and $222,165.50 in 1980.

The Plaintiffs also called Mr. Lidy Wyatt, who is Vice President and Senior Trust Officer of Hamilton Bank in Johnson City. He testified that if money had been invested ¼ in six-month certificates of deposit, ¼ in six-month treasury bills, ¼ in five-year treasury notes and ¼ in A-rated corporate bonds, it would have earned an average of 10.21% between July 1, 1981, and July 1, 1989. He further testified that each of these investments was considered to be an acceptable investment for fiduciary funds.

The court bifurcated the cross-complaint for partition and entered an interlocutory decree partitioning the real estate prior to completion of the trial of the other issues. Upon the conclusion of the trial on the other issues, the court took the case under advisement and later filed a memorandum opinion in which he found the trust did not terminate upon Lisa's reaching the age of 21—it would terminate upon the death or remarriage of Lois. He found the Trustee had breached his fiduciary duty by commingling the trust properties, by not filing an annual accounting, by failing to file annual fiduciary tax returns, by letting a member of the family use trust property, and by renting the trust properties. He found, however, that these breaches of duty did not, *per se*, cause ascertainable monetary loss to the trust. The court found the Trustee should be removed effective upon a hearing by the court to appoint another trustee. He also found the Trustee breached his fiduciary duty by not selling all of the trust estate's interest in the real estate in 1980 for $218,790.55. He then concluded that, because the Trustee failed to sell the property and reinvest the funds, a judgment of $141.041.94 should be entered against him for the trust estate.

The court calculated the sale price of the land by taking the average between Mr. Willis' high and low figures for 1980 values and then deducting 10% of the $218,790.55 as cost for the sale of the property, which left $198,911.50 for investment. He then calculated a 10.21% yield on the investment

between 1980 and 1989, which amounted to $20,104.66 per year, and multiplied that by nine, for a total income of $180,941.94 for nine years. He then subtracted $39,900 for payments made to the trust during the period of time, leaving a balance of $141,041.94 as lost income to the trust, for which he ordered a judgment entered against the Trustee. The court held Samuel would also be liable to the trust for any interest or penalties which might be charged to it by reason of his failure to timely file fiduciary tax returns, and found Lois and Lisa should each be awarded a judgment for $5,000 for the "tort of negligent infliction of emotional distress."

A decree was entered in keeping with the court's memorandum opinion and the Defendant has appealed, presenting the following issues for review: (1) "The weight of the evidence preponderates against the finding of the Trial Court that Appellant as Testamentary Trustee had the authority and duty under the Last Will and Testament of Harry W. Hawkins to make sale in gross of the real estate constituting the corpus of the trust for the purposes of investment"; (2) "The evidence preponderates against the findings of the Trial Court in regard to breaches of duty and the standard of Appellant as Trustee in administering the Harry Hawkins Trust"; (3) "Assuming the authority and duty of Appellant as Trustee to make sale of the corpus of the trust in gross for investment purposes, the weight of the evidence preponderates against the findings of the Trial Court with respect to the value of the real estate, in 1980 and in December of 1989, the proper amount of credits to be given Appellant as Trustee, and the findings of the Trial Court as a basis for assessing damages against Appellant"; (4) "The Trial Court erred in awarding damages for mental or emotional injuries in the absence of allegations or findings of willful tort or any threat of physical injury."

We find the first and fourth issues to be controlling, and modify the decree for the reasons hereinafter set forth. We first consider the Appellant's insistence that the court was in error in holding he breached

his fiduciary duty in failing to make a sale of the real estate in gross in 1980. We hold the court's ruling on this issue was error in that the Trustee was not given authority under the will to make a sale of the real estate in gross and, even if he had had such authority, it would have been imprudent to make such a sale in 1980. We first look to the pertinent provisions of the will of Harry Hawkins which created the testamentary trust. As pertinent here, the will provides:

"ITEM II: I will, give, devise, and bequeath all of my property, both real and personal and mixed, including the proceeds of all life insurance on my life, to my brother Frank Hawkins, of Laurel Bloomery, Tennessee, as Trustee, to be managed, controlled, invested, re-invested, and distributed by my said Trustee *upon the following terms and conditions:*

"1st. The Trustee shall pay to or for the benefit of my wife, Lois Fritts Hawkins, and my daughter, Lisa Hawkins, the entire net income of my estate, or so much thereof as the said Trustee may, in his sole discretion, deem necessary, in monthly, quarterly, semi-annual, or annual installments, until my wife should remarry and/or until my child shall have attained twenty-one years of age. . . .

"2nd. If at any time the Trustee, in his sole and limited discretion, shall be of the opinion that it is necessary and desirable *to encroach upon the corpus of the said trust,* as aforesaid, including the right to sell any lands or real estate, to maintain my wife and/or child, prior to the termination of the trust as hereintofore provided for and after set out, and so as to provide for my wife or child's needs and necessities, and for which the Trustee may deem a reasonable need, the said Trustee is hereby authorized *to encroach upon the said corpus of the said trust* to whatever extent he may determine to be necessary, proper, or desirable, and to pay over to my wife or child, individually, jointly, or in any collective manner, all of the said amount, or portion thereof, or to their use or benefit. This *power of encroachment upon the corpus of this trust is a continuing power for the duration of this trust.*

"3rd. During the term of this trust *neither my wife or child shall have legal demand for any specified or designated moiety of the corpus,* but distribution shall be solely determined by the Trustee taking into consideration the needs and the uses of the individual wife or child and so as to serve the intent and interest of this trust." (Emphasis ours.)

It is first observed that the powers given to the Trustee under Item II are subject to the "terms and conditions" of sub-paragraphs 1st, 2nd, and 3rd. It will then be observed that in sub-paragraphs 1st and 2nd the Trustee is limited to paying the income from the trust estate to or for the benefit of the wife and daughter; however, the Trustee may, in his discretion, *"encroach* upon the corpus of the trust" by selling enough land to meet the needs of the wife and daughter. Also, this "power of *encroachment* upon the corpus" is a continuing thing for the duration of the trust. We think the testator's determination that the corpus of the trust estate be held intact, except for such *increments* thereof as may be necessary to sell from time to time to meet their needs as determined by the Trustee, is expressed in the 3rd paragraph where he provides "[N]either my wife or child shall have legal demand for any specified or designated moiety of the corpus." (Emphasis ours.)

Black's Law Dictionary, Fifth Edition, defines "encroach" as follows: "To enter by gradual steps or stealth into the possessions or rights of another. . . ."

The terms of a trust are to be looked to in determining the existence and scope of the power and duty of the trustee to sell property of the trust estate. The trust instrument, including a will, unquestionably may either expressly or by implication endow the trustee with a power of sale, without any requirement that the power be exercised only upon petition to and order by a court, after an appraisement, or upon the giving of a bond. It may vest broad discretion in the trustee as to the amount of property

to be sold, and as to the time and the terms of the sale. A power of sale given under a will need not be exhausted by one sale and reinvestment but may be exercised whenever it is to the interest of the beneficiaries to do so. On the other hand, the terms of a trust may prohibit, restrain or condition such a sale, and a trustee is without power to alter, change, or dispense with the terms and conditions of a trust pertaining to the sale or other disposition of trust property.

76 Am.Jur.2d, Trust, § 445, p. 662.

We think it is abundantly clear from a reading of the will that it was the intent of the testator to give the Trustee power to sell small increments of real estate from time to time as he deemed necessary for the support and maintenance of the beneficiaries of the trust. To have made a sale in gross of the real estate would have been a violation of powers granted in the trust. Even if the will could be construed as giving the Trustee the power to make a sale in gross, we do not think it could be said he violated his fiduciary duty by not selling the real estate in 1980, as was held by the court.

The record reveals the assets of the estate were not transferred to the Trustee until August 16, 1980. At that time the trust estate held an undivided interest in seven separate tracts of farm land consisting of approximately 350 acres and ownership interest in the tracts of land varied, some being 50%, some 41.6666%, and some 25%. It is not shown in the record what market, if any, there was in Johnson County for such property in 1980, nor is there any evidence in the record of the value of such holdings in real estate in 1980 or 1989. The testimony of Mr. Willis cannot be looked to for fixing such value. Mr. Willis' appraisals relate to property held in fee and divided into tracts of approximately five acres each. "Evidence as to the value of platted or subdivided land is not admissible to prove the value of land per acre or unplatted property." 29 Am.Jur.2d, Evidence, § 398, p. 449.

Can it be said the Trustee violated his fiduciary duty in not selling the undivided interest which he held in that property in 1980? We think the question answers itself. The most any prudent person would have been required to do would have been to have the approximately 350 acres of land partitioned so he could offer a sale of a fee simple title to the property. Such a legal process would have required perhaps a year, using the case at bar as a guide, where the cross petition to partition the land was filed October 3, 1988, and the order confirming the partition was entered October 30, 1989. In Scott on Trusts, Third Edition, Sec. 209, The Administration of the Trust, it is said:

> The trustee is under a duty *within a reasonable time* after the creation of the trust to dispose of any part of the trust estate included in it at the time of the creation of the trust which would not be proper investment for the trustee to make, unless it is otherwise provided by the terms of the trust or by statute. (Emphasis ours.)

Id. at 1691.

Not only would it be necessary to allow time for the partition of the property, but a reasonable time thereafter to make a reasonable sale of the property would be necessary. Also, if we assume we are in error in holding that the terms of the trust did not permit a sale of the real estate in gross, since there was a juvenile who was the remainder beneficiary of the trust and in view of the limitations in the trust, we think a prudent trustee would have sought court approval before making such a sale. *See Alsup v. Montoya, et al.*, 488 S.W.2d 725 (Tenn.1972).

Even though we hold the Trustee was not at liberty to make a sale of the property in gross on his own initiative, under the holding in *Alsup* the court, on remand, may, upon proper application of the trustee and the beneficiaries of the trust, order a sale of the corpus:

> Our law is clear ... that a chancery court has wide discretion and the inherent power to order a sale for reinvestment, such as is being sought here, provided that the sale is manifestly advanta-

geous to the interests of all the parties. (Citations omitted.) 488 S.W.2d 729.

This brings us to Appellant's insistence that the court was in error in awarding damages for the negligent infliction of emotional distress, which is the tort that has become known as "outrageous conduct." In their complaint, the Plaintiffs allege they have suffered greatly from the Defendant's indifference to their financial needs. In his memorandum opinion, the court, in addressing this issue, said: "The plaintiffs' testimony clearly establishes that both of the plaintiffs suffered anguish, distress, anxiety, grief and worry to varying degrees at various times during the administration of the Trust as a result of the Trustee's indifference to the plaintiffs' reasonable financial needs and the Trustee's failure to meet plaintiffs' reasonable financial needs."

The landmark case in this jurisdiction on outrageous conduct is *Medlin v. Allied Investment Company*, 217 Tenn. 469, 398 S.W.2d 270 (1966). In that case Chief Justice Burnett, speaking for the Court, quoted with approval as follows:

These factors are set out in the Restatement of Torts (2d), § 46, "Outrageous Conduct Causing Severe Emotional Distress."

"(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm results from it, for such bodily harm."

Clarification of this statement is found in the following comment:

"d. *Extreme* and *Outrageous Conduct.*

The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotion-

al distress, or even that his conduct is characterized by 'malice', or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous'."

*Id.* 398 S.W.2d at 271.

In the more recent case of *Gann v. Key*, 758 S.W.2d 538 (Tenn.App.1988) the court emphasized the necessity of the conduct's being intentional, saying: "It is seen from the foregoing that damages may be recovered for serious emotional distress *intentionally* or recklessly inflicted by *outrageous* conduct which exceeds in degree willful and wanton misconduct." *Id.* at 546.

The decree of the chancellor is modified to the extent that it awards damages against the Appellant for failure to sell the real estate in 1980 and for inflicting emotional distress on the Plaintiffs. To the extent the decree is not modified, it is affirmed.

The cost in the trial court, and the cost of this appeal, in our discretion, are taxed to the trust estate.

The case is remanded to the trial court for the entry of a decree in keeping with this opinion and for such further proceedings as are appropriate or necessary.

LEWIS and McMURRAY, JJ., concur.