In re ESTATE OF Patricia B. CAVIN

No. 98–PR–22.

District of Columbia Court of Appeals.

Argued Jan. 21, 1999.
Decided April 15, 1999.

Merril Hirsh, with whom Gary V. Dixon, Washington, DC, Stephen E. Baril, Richmond, VA, and Thomas B. McVey, Washington, DC, were on the brief, for appellants.

Bardyl R. Tirana, Washington, DC, with whom Morton N. Goldstein, Silver Spring, MD, was on the brief, for appellees.

Before SCHWELB, FARRELL, and RUIZ, Associate Judges.

FARRELL, Associate Judge:

Defendants/appellants are the trustees under the will of Patricia Burwell Cavin, deceased. Plaintiffs/appellees are the primary beneficiary (Brooks Cavin) and the guardian ad litem on behalf of any residual beneficiaries under that will. This appeal is from a judgment of the trial court after a bench trial concluding, in essence, that appellants (collectively "the Trustees") had breached their fiduciary duty to the beneficiary and remaindermen of the testamentary trust by failing to sell the trust's one-quarter undivided interest in unimproved, non-income producing property in Stafford County, Virginia, by July 1990. The court found that by mid–1988 the Trustees knew or should have known that retention of the land was no longer prudent and appropriate, and that their failure to sell it within the next two years left the trust prey to "an undiversified portfolio" and "the speculative nature of the Stafford real estate market" (which took a strong downturn in the early 1990's), and ignored the "spiraling" needs of the beneficiary, thus depriving him of the " 'safety net' of income" the trust was intended to provide him.

The trial court's decision rests upon three primary factual determinations, all of which we conclude are unsupported by the record. One of these relates to the sufficiency of the trust's liquid assets to meet the beneficiary's needs during the relevant period; another relates to the existence of a market for an undivided interest in real property during the same period; and the third, most importantly, is the court's finding that the Trustees exercised no actual judgment about retaining the land rather than selling it during this time, but instead merely "[went] through the motions" of re-evaluation and "mindlessly reaffirm[ed]" a decision made several years earlier to hold on to it.

Correcting for these factual errors, we conclude that the trial court failed to exercise the restraint which this court and others have required in judicial oversight of the decisions of trust administrators, especially given the contingencies of sale of an undivided interest, partition and forced sale, and conflicting interests of the beneficiary and other interest holders that mark this case. We hold that the Trustees did not breach their fiduciary duty to the beneficiary or remaindermen, and so we reverse the trial court's decision and direct entry of judgment for the defendants.

## I.

Patricia Cavin, the mother of Chandler and Brooks Cavin, died testate on December 21, 1984. In her will she created a residuary trust for the benefit of her two sons. The first codicil named National Savings and Trust (which merged into and became Crestar Bank in 1985) and a longtime friend, Nancy Hirst, as the Trustees. The Trustees were instructed to "pay such portion of the income and principal [of the trust] to or for the benefit of [Mrs. Cavin's] descendants for

their comfortable support and education as the Trustees, in their discretion, shall deem advisable." The trust was to terminate on Chandler's thirtieth birthday and be distributed *per stirpes.* The portion going to Brooks, however, was to continue to be held in trust for him by the same Trustees (hereafter "Patricia's Trust"), who were instructed to pay the income and such principal as they deemed necessary "to or for the benefit of my said son in order to provide adequately for his comfortable support and education." Brooks Cavin had suffered from mental illness which caused him, at the time of his mother's death, to be unable to care for his own funds.

Patricia's original trust for Chandler and Brooks contained an undivided one-half ownership in an undeveloped property comprised of four parcels in Stafford County, Virginia (the "Stafford" or "Cavin Property"), totalling approximately 287½ acres.[1] The other one-half interest in the Stafford Property was contained in a trust created by Mrs. Cavin's deceased husband ("Edward's Trust") for the benefit of Chandler and Brooks. That trust terminated in 1985 on Brooks's twenty-fifth birthday, and Chandler received his one-quarter interest outright. Between 1985 and 1987, Crestar/NS & T held Brooks's ¼ portion in a custodian account; in 1987, at the close of a conservatorship proceeding brought by NS & T, a trust for Brooks (the "Voluntary Trust") was created holding his distributed portion of Edward's Trust. Robert Olshan was named trustee of the Voluntary Trust.

As of Chandler's thirtieth birthday in August 1988, therefore, the Stafford Property was held as follows:

* ¼ undivided interest held by Patricia's Trust for Brooks, with Crestar and Nancy Hirst as Trustees.
* ¼ undivided interest held in the Voluntary Trust for Brooks, with Robert Olshan as Trustee.
* ½ undivided interest held outright by Chandler.

In the spring of 1990 the Voluntary Trust was dissolved and Brooks took possession, in his own right, of the ¼ undivided interest it previously held.

According to John Kociolek, the manager of the trust from mid–1989 through the fall of 1991, Brooks and his wife Nancy (Brooks had married in July 1988) "knew ... that the [Stafford P]roperty was ... the crown jewel ... the only thing they had in order to secure their future and the future of their children ." So, while they did not oppose selling it, "they wanted ... top dollar for the property." Accordingly, the Trustees had decided in 1986 to hold the property for what they expected would be "rapid[ ] appreciat[ion]" given its low carrying costs, the rising real estate market, and the relative liquidity of the trust resulting from the sale of the family home.[2]

In August 1988, however, the Trustees—in particular, William Eanes, Crestar's manager of trust realty for Northern Virginia—concluded "that it was no longer appropriate" to hold the land as an investment, and they decided to sell it "subject to the approval of the co-owners." Despite the increasing real estate market, the Trustees recognized that "there were encroachments" on the trust principal following Brooks's marriage, and that eventually "the cash assets would run out."[3] In late 1988 or early 1989, therefore, Eanes began working with Jo Knight, a Stafford County realtor, to market the property,

1. This property became part of what is known as the "Widewater" plan area, a development project initiated by Dominion Resources. The access road planned for that area would have cut through the Cavin property. The Widewater project had not been approved by the regulatory authority at the time of trial.

2. The sale of the home in 1986 had yielded net proceeds of approximately $944,000, one half of which went into Patricia's Trust and half directly to Chandler and Brooks. Brooks's portion be-

came part of the Voluntary Trust established by the court.

3. Olshan had written to Ms. Sockwell, then the Trust Officer for Patricia's Trust, in December 1987 expressing concern that the liquid funds in the Voluntary Trust would run out before the Stafford Property could be "sold for its maximum value." Ms. Sockwell made an apparent note on the letter, "[s]ame problem for PBC T.U.W. [Patricia's Trust]."

asking her to inform him of any unsolicited offers for the land. Previously, an appraisal had been done putting the value of the property in the current A–1 zoning (agricultural) at $10,500 an acre ($3,019,000 all told), but at $19,000 an acre ($5,463,000 all told) if rezoned to R–1 (residential). Until the appraisal, no contract had come in offering anything near $19,000 an acre. After the appraisal, the talk of selling stopped for a time because Chandler "did not want to divest," and "[t]he bank didn't feel that it was in the best interest of any ownership interest to split and go off in separate directions."

Nevertheless, beginning in October 1988 a series of unsolicited contract offers were received. "[M]ost ... if not all," according to Eanes, were unacceptable because of price or they were contingent on a favorable engineering study and/or rezoning, as well as (in the case of many) seller first-financing. In October 1988, for example, Beechwood Associates offered $12,500 an acre, which the Trustees "decline[d] as to price and contingencies," particularly the deferred financing demanded. In November, Beechwood apparently increased the price per acre by $1,000, but Eanes again declined because of Chandler's opposition to sale and the contingencies, including owner financing. In February 1989 Beechwood made a third offer for $18,000 an acre, containing no rezoning contingency but calling for a feasibility study to allow the buyer to determine "how difficult it may be to get the [R–1] zoning" desired, and to cancel if (in Jo Knight's words) "things weren't as they saw them to be." Still Eanes "[looked] seriously" at the offer since the price was good, but Chandler "wanted to hold out for $20,000 or $30,000 an acre," and cancelled all meetings set up to consider the offer.

Knight presented Eanes with market comparisons, including one for the adjacent Janda Estate for which the selling members of that family had worked out a partition in kind allowing Beechwood Associates to contract to buy some 87 of its 260 acres at $12,000 an acre. Ultimately, as Knight testi-

fied, the Janda contract fell through because Beechwood became "disillusioned with the success of the Widewater Development Plan," see note 1, *supra.* In October 1989 Summit Enterprises offered $15,500 an acre for the Stafford Property, but it too insisted on a feasibility study and owner financing. Olshan, the trustee of Brooks's Voluntary Trust, rejected the offer because he had "problems with every major provision [of it] except the splitting of the transfer tax and recording."

While these offers were coming in, Eanes did not consider offering Brooks's one-quarter undivided interest for sale, believing that not to be "a viable option" since sale of a fractional interest would "greatly diminish the value of the property."[4] Ben Kelsey, the appraiser of the property, agreed that any price offered for a fractional undivided share would be discounted to reflect the cost of a partition suit and the time-value of money for the resulting delay in a contested suit. Also, Kelsey knew of no transactions in the 1988 time frame that had involved minority undivided interests in realty. At the time of trial, Eanes was still unaware of any market for undivided interests in family-owned property in Stafford County.

Eanes, Olshan, and Chandler Cavin (who had majored in real estate in college and worked in the field) were all of the view that a partition in kind of the property was not feasible and would diminish its value because of "the lay of the land." Crestar also did not consider a partition and court-ordered sale (which the opposition of both Olshan and Chandler would require) because, in its view, it "would have indicated a distress situation." Kelsey testified that at a distress price such as a judicial sale after partition would bring, the price would be "anything from ... full market value to fifty percent," stating generally that sale at a public auction would result in a twenty-five percent discount. The bank did not consider threatening partition because, Eanes testified, "[i]t's not the policy of the bank to threaten litigation. We would prefer to use other avenues to bring the co-

---

4. Eanes also may have been of the view—mistaken, as the trial court found—that an undivided interest in land could not be transferred under Virginia law. See note 6 and accompanying text, *infra.*

ownership into a unified investment decision." Instead the Trustees continued to work with a realtor to obtain offers for the property.

Before Brooks was married in July 1988, the trust produced sufficient income to meet his needs. After he and his wife moved to a home in Northwest Washington, they continued to live on "[t]he money that came from the bank." Sometime in 1989–90 they moved to Virginia to reduce their rent, and Brooks's cash needs during this period (increased by the addition of a child in 1989) fluctuated between being "severe" in May 1989 to well within bounds ten months later. At that time, according to John Kociolek, the account administrator for the trust, "Brooks and Nancy had plenty of money" and were not interested in selling the land. In March 1990 Kociolek calculated that Brooks and Nancy had "at least six years of funds ... for them to live comfortably on." By August of that year, however, he saw that "the tide had changed" and Brooks was running out of money. In February 1991 Kociolek was of the view that the trust would have "a couple of more years of cash" if the family moved to a "much cheaper rental unit" and one or both succeeded in getting jobs. By August 1991, as the principal became increasingly depleted, he declared it imperative that they move to "a cheaper apartment or townhouse" and otherwise trim unnecessary expenses.

The parties each offered very different documentation at trial of the liquid assets of the trust between 1987 and 1990. According to the Trustees' Statement of Principal Assets and other exhibits credited by the trial judge, the trust held liquid assets of approximately $144,000 in July 1989 and $109,000 a year later. By December 1990, it was reduced to just over $66,000 in such assets, and by October 1991 to $29,000. In 1992 it ran out of funds. Between 1988 and June 1990 the one-fourth interest in the Stafford Property constituted between 78 and 88 percent of the value of the trust.

In 1988 the trust paid some $13,880 in income and nothing in principal to Brooks; in 1989 he received $20,505 in income and $6,724 in principal; and in 1990 he was paid $6,112 in income and a dramatically increased $58,172 in principal (explained partly by the birth of a second child in September of that year).

In February 1990 Brooks sued Olshan over his handling of the Voluntary Trust. The suit was apparently settled with Olshan's withdrawal as trustee, at which point the trust dissolved and Brooks gained control of its remaining assets, including the one-fourth interest in the Stafford Property. By the time of trial Brooks had not attempted to sell that interest. A second appraisal of the property in July 1990 put its value at $4,325,-000 or just over $15,000 an acre, reflecting its partial placement in a "Growth Area" planned by the county. In late 1990, however, the Northern Virginia real estate market began a sharp downturn—unforeseen by Eanes or the real estate community generally—and reduced the value of the property considerably. By August 1991 inquiries and offers about the property had ceased for the time being.

## II.

The plaintiffs sued the Trustees in 1992 for breach of fiduciary duty. The case proceeded to trial in 1993, and in 1997 the trial court issued a written opinion concluding that the Trustees had

breached their general fiduciary duties by not performing up to the prudent investor standard by failing to sell the interest in the Stafford Property by July 1990. Specifically, the Trustees breached their duty to restructure Patricia's Trust, to sell unproductive property, to diversify Patricia's Trust, and to preserve the assets of Patricia's Trust for the remaindermen.

The court buttressed these conclusions with findings of fact and legal analysis. It found no fault with the Trustees' initial decision to hold the land as an investment. By the summer of 1988, however, the Trustees themselves recognized that retaining it "was no longer appropriate" because the land generated no income and the trust principal was being invaded. Despite these "urgencies" and the inherently "speculative" nature of the real estate market, the court found that the Trustees "did not change their opinion"

over the next two years and, while "go[ing] through the motions of making periodic evaluations," "appear to have just mindlessly reaffirm[ed] the initial decision to retain the Stafford Property." In doing so they were "submissive" to the refusal of Olshan and Chandler to sell, while disregarding the fact that "[a] market for an undivided interest [in such property] existed from 1987 up to the time of trial." Further, although admittedly forcing a partition and sale of Brooks's fraction would have meant a "significant" discount of approximately 25%, the Trustees should have pursued that option as well,[5] particularly when by July 1989 "[t]he inadequacy of the income productivity of Patricia's Trust was glaring." Indeed, even "early in 1988 . . . [t]he spiraling urgency to provide income for Brooks was unmistakable." The court found that the Trustees had "continually misjudged the productivity of the [liquid] assets, assuring the parties that Patricia's Trust could support Brooks for many years" when "[i]n fact, the money lasted only 2 ½ years after that assessment."

Citing authority holding a Trustee liable for excessively concentrating trust assets in one vehicle, the court concluded that "the Trustees' decision to retain such a high percentage of the Patricia Trust in non-income producing unimproved land, when the Grantor had established the trust to provide for the welfare of the income beneficiary, was improper." "[A]s the Trust dwindled and the Plaintiff Brook[s's] family hung in the balance, the Trustees remained complacent." The court ruled, therefore, that "as of July 6, 1990," the Trustees "shall be deemed to have purchased the one-quarter interest in the Stafford Property," that date marking the limit of "a reasonable time" within which they could have sold the interest given their own decision that retention after mid–1988 was "inappropriate." The "purchase" price or surcharge was to be $1,000,697, reflecting the July 1990 appraisal of the one-quarter interest at approximately $1,081,250, discounted by 25% for the sale of a partial interest and adjusted for inflation.

5. Doing so, the court believed, might "have had the effect of coaxing the other Stafford Property owners to join in selling the property on the open market to avoid the discount."

### III.

■ Our review of findings of fact by the trial court is, of course, limited. D.C.Code § 17–305(a) (1997); *see, e.g., In re A.S.,* 614 A.2d 534, 536 (D.C.1992) (court of appeals may not disturb findings of fact unless they are clearly erroneous). On the other hand, the ultimate question of whether trustees have breached their fiduciary duty, involving the application of legal principles to the facts as found, implicates the appellate role directly and permits only lesser deference to the trial court's decision. *Cf. Davis v. United States,* 564 A.2d 31, 36 (D.C.1989) (en banc). And our review is made more searching because of the principle that "[c]ourts should generally be slow to entertain attacks on decisions of trust administrators 'except when it is made to appear that they have acted out of fraud, malice, bad faith, or in an arbitrary abuse of their discretionary powers.' " *Jones v. Hagans,* 634 A.2d 1219, 1224 (D.C.1993) (quoting *Kloman v. Doctors Hosp.,* 76 A.2d 782, 785 (D.C. 1950)). Above all, courts may not apply "the unerring view of hindsight . . . to determine the propriety of [a trustee's] administration of the Trust ." *Dennis v. Rhode Island Hosp. Trust Nat'l Bank,* 571 F.Supp. 623, 631 (D.R.I.1983).

■ Our analysis of the Trustees' conduct begins with the "General Standard of Prudent Investment" which the RESTATE-MENT sums up in part as follows:

> The trustee is under a duty to the beneficiaries to invest and manage the funds of the trust as a prudent investor would, in light of the purposes, terms, distribution requirements, and other circumstances of the trust.
>
> (a) This standard requires the exercise of reasonable care, skill, and caution, and is to be applied to investments not in isolation but in the context of the trust portfolio and as a part of an overall investment strategy, which should incorporate risk and return objectives reasonably suitable to the trust.

RESTATEMENT (THIRD) OF TRUSTS § 227, at 8 (1992). As is evident, a court's initial focus must be on the terms of the trust. As with any provision of a will, a testamentary trust "is the personal expression of a testator's donative intent, and it is the intent of the testator which controls the disposition of [her] estate." *O'Connell v. Riggs Nat'l Bank*, 475 A.2d 405, 407 (D.C.1984).

Patricia Cavins' Trust bequeathed the residue of her estate to the Trustees, in trust, to "pay such portion of the income and principal thereof to or for the benefit of" Brooks and Chandler "for their comfortable support and education as the Trustees, in their discretion, shall deem advisable." In the case of Brooks, the trust was to survive distribution of Chandler's part, and the entire net income was to be provided to him during his lifetime. In addition, the Trustees were "authorized, in their discretion, to make payments from the principal ... to provide adequately for his comfortable support and education." The will emphasized that "the decision of the Trustees as to the need for and the amount of any such payment from principal shall be conclusive." Moreover, the Trustees, "in their sole discretion," were permitted (*inter alia*) to "[r]etain, invest and reinvest in any real or personal property," as well as to "[s]ell at public or private sale" and "exchange and partition property." They were expressly "not ... required to diversify." In exercising their discretion as to the use of the principal, they were allowed to "take into account any other property and income available to [a] beneficiary."

The trial court recognized the Trustees' broad discretion to make payments from principal and to retain real property (without need to diversify), and so found no problem with their judgment to hold the Stafford Property through mid–1988. It found, however, that the Trustees themselves then decided that further retention of it was "inappropriate" and yet, over the next two years, simply rubber-stamped ("mindlessly reaffirm[ed]") their initial decision to retain it. We thus are met at the outset with the court's finding that the Trustees *exercised no actual judgment* regarding sale or retention of the property from 1988 forward. If that finding is unsupported by the record, the court's conclusion of a breach of fiduciary duty is seriously undermined. One can understand, of course, the plaintiffs' effort to cast the Trustees' performance in so harsh a light, because the exercise of judgment in an area like this—where judicial oversight is limited—necessarily includes the possibility of reasonable *mis*judgments. *See, e.g.*, GEORGE G. BOGERT & GEORGE T. BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 541, at 169 (2d ed. rev.1993). But a finding by the court that the Trustees exercised no judgment on this key issue must be supported by the record, and we conclude that it is not.

■ It is simply not possible to find on this record that the Trustees blindly adhered to their original decision to retain the land. To start with, the trial court misapprehended the decision they made in the summer of 1988 that retention was no longer appropriate. The Trustees did not decide that a sale was necessary or desirable at all costs; their decision rather was to attempt to persuade Chandler and Olshan to sell the property *as a whole* since anything less, in Eanes's view, would seriously discount its value. Thus, working with Jo Knight, the Trustees received and considered a succession of offers for the parcel as a whole and conferred repeatedly with Chandler and Olshan about them. They met resistance partly because of price but also because, as they themselves agreed, the contingencies attached—such as feasibility study periods (with the buyer's unilateral right to withdraw) and owner financing—tended to make these (in Eanes's words) "buyers' contracts." Yet they evaluated each offer that came in to determine whether it was a prudent sale opportunity. That is assuredly not the failure to exercise any investment judgment which the trial court portrayed.

The trial court also found that the Trustees had not reasonably considered the option of selling Brooks's undivided interest by itself. It seized upon the evidence that Eanes had not consulted legal counsel on this point and apparently believed that an undivided interest as a tenant in common in realty

could not be transferred under Virginia law.[6] The court found that in fact "[a] market for [the sale of] an undivided interest existed from 1987 up to the time of trial."

There are two problems with this analysis. First, it states at best only half of the reason why Eanes would not attempt a sale of Brooks's fractional interest. Equally important to Eanes, if not more so, was that such a sale would "greatly diminish the value of the property," a view shared by the appraiser Kelsey and co-trustee Hirst. Yet even if a mistaken understanding of the law also influenced his judgment, that ultimately does not matter because the record does not support a finding that a market for such undivided interests existed in Virginia at the time. *See In re Estate of Stetson*, 463 Pa. 64, 345 A.2d 679, 687 (1975) ("[A] fiduciary justifies its retention of an investment which becomes improper when it proves that disposition of the investment was impossible because no market for it existed and the absence of a market is not due to the fiduciary's failure to exercise skill, prudence, and diligence.").

One piece of testimony cited by the court for its contrary finding is the appraiser Kelsey's admission that "it would be more difficult to find a buyer for an undivided interest [in] property such as the Cavin Tract in a cool market than in the hot market of 1987 to 1989." But this does not assert the existence of an actual market,[7] a fact confirmed by Kelsey's earlier testimony that he did not know of any purchases or sales of undivided interests in Stafford County realty in the 1988 period. The court also referred to the purchase of a one-sixth interest in adjacent property by Beechwood Associates (the Janda contract). But that contract, which ultimately fell through when the buyer (Beechwood) became disillusioned with prospects for development in the Widewater area, had been for the purchase of property partitioned in kind by the members of the Janda family, something no one considered feasible for the

Cavin tract. None of the offers for the Stafford Property mentioned the possibility of purchase of an undivided interest. Although Jo Knight suggested that Beechwood was amenable to an undivided interest, Beechwood never made such an offer for the Cavin property and, as mentioned, lost interest even in a parcel partitioned in kind. Summit Enterprises, another potential buyer, had not bought an undivided one-quarter interest as a minority shareholder in recent years, and Eanes, at the time of trial, still knew of no market for undivided interests in family-owned property in Stafford County. Thus, the trial court's conclusion that the Trustees uncritically ignored a realistic option for sale of Brooks's interest is without support in the record.

■ The court separately found a breach of duty in the Trustees' failure to pursue a partition and a judicial sale. Importantly, this cannot be taken to illustrate their failure to exercise *any* investment judgment because there is no dispute that they considered the option of a forced sale and rejected it. The trial court's finding of breach, therefore, rested upon the determination that even the "significant" loss in value a judicial sale would entail was necessary to fulfill the trust (designed as a "safety net") if, as the court found, Brooks's needs were "glaring" by 1988–89 and the liquid assets of the trust were running out. We discuss this finding of need shortly, but we pause to examine the situation facing the Trustees in regard to a possible partition and judicial sale.

■ As the trial court recognized, that option guaranteed a sale at well below market value because " 'fair market value' presumes market conditions that, by definition, simply do not obtain in the context of a forced sale." *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 538, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994). A twenty-five percent diminution in value (accepted as the measure

---

**6.** Appellants, pointing out that Eanes repeatedly entertained unsolicited offers for the property, argue that the trial court wrongly ascribed to Eanes a belief that an undivided interest could not be *transferred*, when he only believed it could not be listed—a matter they claim to be uncertain under Virginia law. We have no need to

consider whether that was in fact Eanes's view, nor to explore Virginia law on the point.

**7.** All it appears to assume is a "hot market" for real estate generally, not a "hot market" or any type of market for undivided interests.

by the trial court), on a one-quarter property interest valued at nearly a million dollars, is enough to give any prudent investor pause. Eanes, moreover, had full reason to believe Olshan and Chandler would oppose that sale since they had continually resisted sale of the unified property in a rising market. And an action setting Brooks at odds with himself (through dueling trustees) could only have complicated the matter.[8] No testimony was presented as to how long a judicial partition and sale in Stafford County would be expected to take.[9] And the trial court's suggestion that "aggressive[ ] pursu[it]" of partition might have pressured Chandler and Olshan to agree to sell the property as a whole rather than incur the discount of a forced sale is speculative and turns trustee judgment into a sort of bluff.

We come back, then, to the trial court's finding that the Trustees failed to heed "[t]he spiraling urgency to provide income for Brooks" which was "unmistakable" even "early in 1988" and certainly by July 1989 when the "inadequacy of the income productivity of [the trust] was glaring." This finding that stern measures—even sacrifice of a fourth of the land's value—were demanded by the situation beginning in 1988 is critical to the court's ultimate finding of a breach, for at least three reasons. First, Brooks himself was not looking to sell because he viewed the land as a long-term investment (the "crown jewel") to be sold only at "top dollar." Second, the trust permitted the Trustees to invade principal and made their decisions as to

"the need for and the amount of any such payment from principal ... conclusive." Third, the trust was explicit in not requiring them to diversify investments.[10] Therefore, as the trial court recognized, only if the basic purpose of the trust as Brooks's "safety net" was threatened were the Trustees obliged to take the exceptional measure of a forced sale at a substantial discount.

The record does not support the finding that the trust was inadequate to support Brooks's needs in the 1988–89 period. Brooks was paid under $14,000 from trust income in 1988 and approximately $27,000 in 1989, only $7000 of the latter from principal. That left the trust still with $144,000 in liquid assets in July 1989, and $109,000 a year later. In March 1990, according to Kociolek, Brooks and Nancy "had plenty of money" and the trust was expected to allow them to live comfortably for another six years. They themselves were not interested in selling the land—or even borrowing against it—but instead wanted it "to continue to grow over time." These circumstances reveal a very different picture from the "spiraling urgency" described by the trial court in the 1988–89 period. Of course, by August 1990 Kociolek admitted that "[t]he tide had changed," and Brooks was then looking to sell. For the whole of 1990, he was paid a dramatically-increased $64,000, explained partly by the birth of a second child in September, and the trust was down to $66,000 in liquid assets by the end of the year. But the record clearly does not support a conclusion that the Trust-

8. Once the court-established Voluntary Trust dissolved around the spring of 1990, Brooks, now the outright owner of the undivided one-quarter interest, gave no indication of wanting to sell. A forced sale thus would have set the Trustees against a beneficiary competent to make his own decisions regarding an equal portion of the same property. *Cf. Washington Loan & Trust Co. v. Colby*, 71 App.D.C. 236, 239, 108 F.2d 743, 746 (1939) ("[T]he beneficiaries of a trust who suffer from no disability and who have full knowledge of the facts and of their legal rights, may direct the trustees in the investment of trust funds and if losses are sustained they cannot be heard to complain.").

9. Another court has described the delay attendant on that process:
   The most any prudent person would have been required to do would have been to have the

approximately 350 acres of land partitioned so he could offer a sale of a fee simple title to the property [as opposed to selling an undivided interest outright]. Such a legal process would have required perhaps a year ....

\* \* \* \* \* \*

Not only would it be necessary to allow time for the partition of the property, but a reasonable time thereafter to make a reasonable sale of the property would be necessary.
*Phillips v. Taylor*, 833 S.W.2d 927, 933 (Tenn.Ct. App.1992).

10. At all events, "[t]he duty to diversify ... is not absolute .... [T]he trustee should consider whether disposition will allow the trust to realize and retain the full value of the property in question ...." RESTATEMENT (THIRD) OF TRUSTS § 229 cmt. d, at 123.

ees were bound to sell the land at a discount by July 1990, when Brooks's needs were only first becoming acute. The case was tried on the theory, ultimately accepted by the trial court, that the Trustees should have begun the partition process fully eighteen months before July of 1990. That theory simply was not borne out by the evidence.

 The RESTATEMENT (SECOND) OF TRUSTS states:

> The trustee is not liable for delaying to sell because he cannot obtain a fair price for the property. Thus, in the case of real estate or other property which does not have a ready market he can properly delay selling until he can obtain an offer to buy at a price which he reasonably thinks represents a fair value for the property.

Section 231, cmt. c, at 552. Indeed, the trustee "is subject to liability if without exercising a reasonable amount of prudence he sells at an unnecessary sacrifice." *Id.* Had the Trustees, against the wishes of the other interest owners including their own beneficiary, pushed for a sale at a "distress price" before Brooks's needs demanded it, they would have invited a lawsuit for selling the main asset of the trust at an unnecessary sacrifice. If that seems imaginary, one need only ask how matters would have looked if the partition process the court found should have begun in 1988–89 had reached conclusion not in July 1990 but only months later, when the value of the land had dropped sharply. Just as there is no evidence that the trust solvency was in a downward spiral in the 1988–89 period, so the evidence showed a real estate market in that period marked by continuing appreciation in which the Trustees could reasonably expect to receive "top dollar" if all of the ownership interests agreed to sell, something they continued to pursue. All agree that the sharp dip in real estate that began in late 1990 was unforeseen. While that coincided with the depletion of the trust's liquid assets by 1992, we conclude that only the forbidden point of view of hindsight would enable us to hold that the Trustees' strategy of pursuing a unified sale of the property in the 1988–90 period amounted to a breach of their fiduciary duty.

The judgment of the Superior Court is therefore reversed, and the case is remanded with directions to enter judgment for the defendants.

*So ordered.*